PROVO STY, J.
The plaintiff, the Female Orphan Society, is an incorporated charitable institution intended to be perpetual. *279 Julian Poydras, in 1817, made to it a donation inter vivos pure and simple of certain real estate, with no condition attached, except that the property should never be alienated. Recently, defendant agreed to buy a part of the property, but, on discovering the presence of this condition in plaintiff’s title, refused to carry out the agreement, and this suit is to compel it to do so.
Plaintiff contends that the condition of inalienability attached to the donation is contrary to public policy, in that it puts the* property out of commerce; and that therefore, under article 1519, Civ. Code, it must, be considered as not written.
Plaintiff also contends that it has possessed the property for more than 30 years, and has acquired by prescription an unconditional title; and that therefore the said condition, if ever valid and binding, is no longer so.
The latter contention we simply brush aside. One cannot prescribe against one’s title. Civ. Code, art. 3514. The case of Cannon v. Female Orphan Asylum, 24 La. Ann. 452, which plaintiff cites to the contrary, znust be looked upon as nothing more than additional evidence of the liability of the best of judges, like the best of poets, to sleep sometimes.
The other contention raises a question that has never been passed on by this court, and that is not expressly covered by any article of the Code or other statute, namely, whether a condition of inalienability is valid. We have not much hesitation in declaring that such a condition is void, both as contravening our codal provisions regarding ownership, and as being against public policy.
The effect of such a condition would be that the right to alienate would be vested in no one — not in the donee, because such would be the express condition; not in the donor, or his legal heirs, because such, again, would be the express condition. Now, the right to alienate is an essential element of ownership. An ownership without the right to alienate being vested in some one is an impossibility. Accordingly, we find that at: common law, apart from all statutory influence, a condition of inalienability in a deed or devise in'fee simple is void, as being “repugnant to the title.” 24 A. & E. E. 864. In our law, the essential elements of ownership are statutory. Our Code defines-ownership and expressly prescribes • how it shall be composed. Article 488 et seq. These-affirmative provisions are pregnant with the-negative, that other modes are disallowed. Parties are not left free to invent and create-such tenures as they please, but are required, to hold their property in the modes thus prescribed. All other modes are impliedly forbidden. It is clear, then, that, under our-law, an ownership, without the potestas alienandi being vested in some one, is an impossibility — finds no place in our Code’s-. scheme of the tenure of property — and is-therefore impliedly forbidden. Hence the-conclusion is inevitable that a condition of' inalienability contravenes the provisions of our Code regulating the tenure of property, and is therefore “contrary to law,” and must, be reputed not written.
In Harper v. Stanbrough, 2 La. Ann. 381, Eustis, C. J., said:
“It is the attribute of every government to-establish and regulate such modifications of the-rights of property in things within its jurisdiction as the public interest requires.”
And, again:
“The modifications of the rights of property-under our laws are few and easily understood,, and answer all the purposes of reasonable use-It is incumbent on courts to maintain them in. their simplicity.”
In Succession of McCan, 48 La. Ann. 158, 19 South. 220, the court said:
“Our law is marked by the simplicity of the-titles by which property is held, and is utterly-opposed to the suspended and uncertain ownership incident to substitution of the system of entails of the common law. It is our policy that ownership should vest at the death of the-testator, so that there should exist no restraint: on alienability of property.”
*281 Again, in the case of Succession of PrankJin, 7 La. Ann. 395, speaking for the court, -Judge Rost, the same whose dictum is hereinafter quoted, said:
“Under the view I have taken in the case it Is unnecessary to answer the argument that the establishment of property by will is not prohibited in Louisiana. I may state, however, that the powers given to testators by the Code ■are exceptions to the general law, regulating the devolution of property, that they are limit■ed both as to form and substance, and that it is not enough to say that the perpetuities are not prohibited. It should be shown that they rare authorized. The testator has full power to vest in his legatees the title to the property he leaves; but he cannot vest in them a title which he has not, and_, if he attempts to do so, the legal title of which he does not dispose passes to his heirs at law. The extent of his power over his property after his death is the right to separate the usufruct from the ownership for a single life. If he attempts in any manner to control the descent of the property after the death of the first legatee, the entire ■disposition falls. He cannot change the nature ■of the title he transmits, or, in the language of Lord Brougham, ‘impress upon his lands and tenements a peculiar character, which ■should follow them into all hands, however, remote,’ such as would be impressed upon them by the creation of a perpetuity. His power is limited to the transmission of the title which he holds. He may use, and abuse, his property, while he lives, and delegate those rights to others by will; but he must devest himself of “both when the power to use terminates. By his death the right to abuse also ceases, and if he attempts to exercise that right by creating a title which cannot be enforced, without subjecting the soil of Louisiana to the dominion of foreign laws, the disposition falls, and is ■superseded by the general laws of successions, unless the heirs at law have themselves been superseded by other dispositions in the will.”
And in the same case Eustis, O. J., said:
“I am under the conviction that the right which a man has to dispose of his property by will, to take effect after his death, is derived exclusively from the law of the land, which has established this right as an incident to the right of property. The law has (Civ. Code, art. 476) ordained certain forms and imposed certain conditions on this species of alienation, which are essential to its validity. Civ. Code, art. 1453. A man has no more power to create ■a new or prohibited modes of property, in the exercise of his right to make a will, than he has in a sale or a donation inter vivos. Between parties, they may hold their property by any tenure or terms they please; but, as to the establishment of titles affecting the property itself, there is no power in man out of the law. Nor has society any interest in attempting to carry into effect the conceits of the dead, to the disturbance of their rules of public order and policy, which regulate the living.”
In a recent case, in Succession of Kernan, 52 La. Ann. 48, 26 South. 749, the court said:
“It has become elementary with us that the testamentary power must be exerted in subordination to the titles of ownership prescribed by the Code. Our law will not tolerate the introduction of tenures not recognized by the Code, and in the Code full ownership with its modification received explicit determination. Articles 488, 533, et seq. The Code prohibits donations inter vivos or mortis causa, substitutions, fidei commissa, and conditions contrary to law and morals. In the will before us there is the designation of the archbishop of the diocese of Louisiana and his successors in office forever as the legatees, on the condition that the revenues of the property shall forever be applied to the benefit of the institution designed by the testator. The argument insists we are to treat the legacies as in favor of the corporation known as the ‘Society of the Roman Catholic Church of the Diocese of New Orleans,’ of which the archbishop is the representative. Whether we hold the church or the archbishop to be the legatees, we are confronted with the difficulty arising from the title the will seeks to create. The will conveys no ownership. The title, such as it is, is one of mere administration. Whether held by the church or the archbishops, the property is to be forever inalienable. It requires no argument to demonstrate that no such title has any place in our Code. The will in our view would be obnoxious to our law in seeking to introduce an impossible and illegal tenure.”
These extracts suffice to show that the view heretofore taken by this court has been that the provisions of our Code regulating the tenure of property are exclusive of other tenures.
Passing to the question of whether the condition of inalienability contravenes public policy, by putting the property out of commerce, and is for that reason “contrary to law,” we find that at common law such a condition is exceptionally held valid in a devise to charitable uses (6 Cyc. 926; 24 A. Sc E. E. 865); and we find, also, that Judges Rost and Preston (than whom, we are aware, no man who ever sat upon this bench has made a more profound study of the branch of our law to which this question belongs) *283 have expressed themselves in favor of the common-law doctrine of the validity of such a condition in a donation for pious uses. Thus:
In his concurring opinion in the celebrated McDonogh Will Case, 8 La. Ann. 259, Judge Rost said:
“I believe that the condition not to alienate, for instance, is as binding in a case like this as in the dispositions made by Almonaster and Fisk, already referred to, and that a city may, in such a case as this, be deprived of the jus abutendi over its property for an object of public utility, without its right of property being affected thereby; and that the Legislature have always the right to remedy the effects of the disposition whenever the alienation of the property given becomes of public advantage.”
In a dissenting opinion in the case of Succession of Franklin, 7 La. Ann. 395, Judge Preston said:
“I find no law of our state opposed to the inalienability of property, destined by its revenues to support an institution of public utility, intended from its nature to be perpetual, and all good policy indicates that such property should be inalienable to prevent the waste, extravagance, and exposure to total loss, by being converted into money. There are, and always will be, plantations and property for sale in Louisiana, without forcing into the market the very few that will ever be destined, by their revenues, to the support of establishments of public utility. The equal distribution of estates among children and other heirs, by our laws, and many other causes which it is unnecessary to detail, will forever prevent the burdensome accummulation of estates or their inalienability to an extent at all injurious to the state; and, when that occurs, the sovereign state may direct the alienation of the property and prohibit its inalienability in the future.”
The idea here, as at common law, is that donations for pious uses should be encouraged by upholding conditions without which probably the donor would not have been willing to make them, and that, inasmuch as such uses are in their nature perpetual, the property would not be likely to be ever alienated, even in the absence of such a condition, and hence the conditioh is not likely to do great, harm, and any disadvantage to the public from the property being put out of commerce is outweighed by the advantage of encouraging such donations, and consequently such a condition in a donation for pious-uses is not against public policy.
That there is much force in that view of" the matter is shown by its adoption at common law; but in a state governed exclusively-, by written laws, as ours is, the courts are-much less free to determine what is or is-not public policy. The public policy of a. state thus governed by written laws is not a~ mere matter of impression or opinion, or a matter to be determined from what appears-to be, or not to be, to the public interest but it is a matter expressed more or less definitely in those written laws, and to be there-searched for, and, when found, to be enforced: with the same inflexibility as the written laws themselves. Oye. verbo “Contracts.”
Whether the common-law courts would consider themselves at liberty to refuse to enforce in any given case a recognized public-policy, we do not know. We do not understand that a condition of inalienability in a devise to charitable use is there held to be-valid, although against public policy;' but. that, for lihe reasons hereinabove stated, it is held ndt to be against public policy. However, whatever- latitude the common lawcourts may enjoy in that regard, ours, enjoynone whatever, but are rigidly tied down by an express! statute, which declares that parties cannot by 'their 'conventions'' de'rogatefrom public policy. Civ. Code, arts. 11, 1895,
Looking to our written laws to. ascertain what .is the public policy of this'státe on the-subject of the putting of property out. of^comT. merce, we find the following:
We find in article 265 of the Constitution a sort of mortmain statute. A corporation is-forbidden from holding real estate longer than 10 years, except as necessary for its-business.
In articles 1570 and 1571 of the Civil Code, forbidding fidei commissa and substitutions,, we have statutes against perpetuities.
*285 By articles 606 and 612, Civ. Code, a usufruct cannot be for more than one life when the usufructuary is an ordinary person, and 30 years when a corporation. Testators cannot require their estates to be held in indivisión longer than five years. Oiv. Code, art. 1300. And a contract for holding property in indivisión can be only for a limited time. Article 1298, Civ. Code.
Only by special exception, and because of the high degree of favor with which marriage is regarded, dotal property is made inalienable during marriage. Civ. Code, art. 1358.
The following excerpts from the decisions of this court show that the very reason why fidei commissa and substitutions are prohibited is that they tend to put property out of commerce. If so, by how much the more is an express condition of inalienability prohibited.
In the case of Mathurin v. Livaudais, 5 Mart. (N. S.) 302, Judge Porter, in delivering the opinion of the court, declared that:
“Our Code abolishes substitutions and fidei commissa. The object of this change in our jurisprudence was, as it is well known, to prevent property from being tied up for a length of time in the hands of individuals and placed out of the reach of commerce.”
In Heirs of Cole et al. v. Cole’s Executors, 7 Mart. (N. S.) 416, the same judge, again the organ of the court, observes:
“It is necessary to check the power of the citizen over his property after his decease, for the strong desire in mankind to perpetuate their authority, over what they have acquired, would otherwise induce them to place it for a length of time, and forever, if they could, out of the reach of alienation.”
In Arnaud v. Tarbe et al., 4 La. 502, Judge Mathews declared that:
“The policy of our law, in prohibiting substitutions, is founded on reasons of public convenience and utility, to preserve the order of successions uniform, to prevent the confusion, difficulties, and uncertainties of titles to property held under entails, and to leave it free for the purpose of commerce.”
In Henderson v. Rost, 5 La. Ann. 441, the court said:
“It is said that the provisions of the will do-not amount in law to a substitution or fidei commissum, and, consequently, are not reprobated' by law. Conceding that they do not fall technically under either of these denominations, still they are clearly opposed to the policy of our laws and jurisprudence, which resists the-perpetuation of estates. Their spirit is to prevent property from being tied up for a length of time in the hands of individuals, and. placed out of the reach of commerce.”
Such excerpts could be multiplied almost indefinitely, as our reports are filled with them; but these here given will suffice. Their expressions are equally applicable to donations for pious uses — in fact, the cases of Succession of Franklin and Henderson v. Rost involved donations of that character.
But the question of the policy of our law, on the subject of a condition of inalienability in a donation for pious uses, is placed beyond the pale of discussion by act No. 124 of 1882, p. 172. That was an act passed for the avowed purpose of extending the utmost favor to donations for pious uses by exempting them from the operation of the prohibition against substitutions and fidei eo-mmissa. The act provides that fidei commissa and substitutions shall be valid when in donations-for pious uses; but adds the following very significant proviso:
“Provided, however, that property donated' cannot be made inalienable, but the donor-' thereof shall have the right to prescribe in what manner and under what circumstances the trustees shall be empowered to sell the same, or to-change any investment once made.”
Not much reading between the lines of this act is required for seeing that, in enacting it, the Legislature was anxious to throw the doors as wide open as it possibly could in favor of donations for pious uses, but that it considered the motives of public policy against the permanent inalienability of property to be too strong to be overridden or put aside even in so good a cause.
Whatever, therefore, may have been the *287 -situation before the enactment of that statute, -certainly, now, the public policy is opposed to the validity of a condition of inalienability in .a' donation for pious uses; and, such being the case, a condition of that kind is contrary to law, and must be reputed not written.
We do not mean to be understood as holding that the donor cannot make the donation ■on such terms that it shall lapse and the property revert to himself or his heirs on the violation of the condition; nor do we mean to hold that a particular destination may not be affixed to property given for pious uses. 'That this may be done may be considered well settled. McDonogh Will Case, 8 La. Ann. 256; Pontalba v. Copland, 3 La. Ann. 86; Will of Mary, 2 Rob. 440; Duke of Richmond v. Milne, 17 La. 312, 36 Am. Dec. 613. But Poydras imposed no condition except that of Inalienability. AH' we hold is that a condition ■of the latter description is illegal even in a ■donation for pious uses.
In France, by the royal ordinances of 1731, 1749, and 1762, donations for pious uses were ¡allowed to have effect only after a special authorization had been obtained in each case from the government; and such is the law in France to-day, with some slight modifications. Dalloz, Petite Collection, Code Civil, art. 910.
Apart from this, and apart from the act of 1882, above referred to, the legislation of France, in whatever may concern the validity of a condition against alienation, is identical ■with ours. Hence the jurisprudence of that country must carry very great weight on this point, and we find that it is unanimous .against the validity of such a condition, as appears by the following extract from Carpentier & Du Saint, verbo “Condition,” No. :343:
“One condition fort usitée est celle qui restraint la faculté pour le donataire ou le légataire de disposer de la chose donnée ou léguée, soit directment, soit indireetment, par acts entre-vifs ou par testament. Les tribunaux •out eu fréquemment il trancher des difficultés relatives á des clauses de ce genre. II est de l’intérét général, il importe & la richesse publique, que la circulation des biens puisse s’opérer librement et sans entraves. Aussi tout le monde est-il d’accord pour regarder comme contraire & l’ordre public et comme illicite la condition absolue et indéfinie de ne jamais aliéner. Merlin, Rép. Vo. Substit. Fidéi Comm., sect. 8, n. 5 bis: Toullier, t. 5, n. 51, et t. 6, n. 488; Troplong, Contrat de Mar., t. 4, n. 3059; Donat. et Testam. t. 1, n. 271; Demolombe, Rev. Crit., t. 1, p. 158; Encyl. du Dr. Vo. Condition, n. 172; Rolland de Villargues, Vo. Prohibition d’Aliéner, n. 8; Demolombe, t. 18, n. 291 et seq.; Laurent, t. 11, n. 461; Aubry et Rau, t. 7, § 692, p. 296; Massé et Vergé, sur Zachariae, t. 3, § 464, tâte et note 12, p. 180; Bartin, p. 165.”
See, also, Despinois c. Beauvois, 16 Mars 1877, Journal du Palais 1877, p. 514; Héritiers Michel c. Combes, J. du P. 879, p. 331; Cordeviola c. Ramband, J. du P. 1894, p. 93; Mazaran c. Commune de Chemille, J. du P. 1880, p. 20; Berrand c. Marie de Flangebouche, J. du P. 1896, vol. 1, p. 29.
The two last of these cases involved donations for pious uses.
Laurent t. 11, No. 460, gives the rationale of this jurisprudence as follows:
“The condition is admitted to be illicit. This presupposes some law that forbids it. What law? None can be found which formally declares that a condition of inalienability shall be illicit. Awhile ago we cited the dispositions of the Code which imply that the lawmaker reprobates inalienability; if he tolerates it under the dotal system, he does it solely in favor of marriage; and even then he places upon it the restriction that it must be stipulated in the marriage contract itself. Article 896 furnishes an analogous argument. It prohibits substitutions. One of the motives of this prohibition is that the property upon which the substitution bears is put out of commerce, and this is contrary to the public interest which requires the free circulation of property. Hence it follows that the condition of inalienability is impliedly forbidden by the law. In further support of this opinion, article 6 may be cited, which forbids individuals from derogating from the laws which concern the public interest. This very vague expression applies in its widest acceptation to the interest of society in general; and it is not altogether necessary that there should be a special law for every case that may present itself, for, under the terms of article 1133, the cause is unlawful when it is contrary to public order. From the combination of these principles, we may lay it down as a principle that every condition that is contrary to the interest of society in general is illegal, and falls, as such, under the application of article 900. Now, *289 inalienability is in opposition to a fundamental law of political economy — the law which requires the free circulation of property. This law interests in the highest degree the public wealth, and as a consequence every condition which derogates from it is contrary to the public interest, and is, in that sense, illegal.”
See, to the same effect, Dalloz, Rep. Dispositions, No. 179.
We conclude that the condition in question is contrary to public policy, or, in other words, “contrary to law,” and must he reputed not written.
The idea suggests itself that, having agreed to the condition by accepting the donation, the donee should now be held estopped from contesting it; but that objection is only specious. It concedes that the condition is reputed not written, and yet supposes that the donee has accepted it, which is an absurd supposition, since an unwritten, i. e., nonexistent, condition cannot be accepted. The hand of the law strikes the condition out before the donee or legatee is called upon to accept or renounce. Hence, in contemplation of law, the donee has not accepted the condition. If this court were to adopt and adhere to the doctrine that conditions reputed not written are nevertheless binding upon donees and legatees by estoppel, how many donations and testaments, now maintained, would have to be annulled because the illegal or immoral conditions in them, although reputed not written, yet would be binding upon the donee or legatee by estoppel. Moreover, this objection resolves itself into the proposition that, although the donee cannot sell the property directly, he may do it indirectly, by contracting a debt and letting it be seized and sold by the creditor.
It is therefore ordered, adjudged, and decreed -that the judgment appealed from be set aside, and that the defendant, the Young Men’s Christian Association, be condemned to accept title to the property described in the plaintiff’s petition herein, and to pay to the plaintiff the price agreed on for the same, viz., $4,500, with interest at the rate of 5 per cent, from February 26, 1906, until paid, and to pay the costs of this suit.
BREAUX, C. J. I dissent.