PBOVOSTY, J.
On submission by the judges of the Court of Appeal, Second Circuit, applying for instructions under article 101 of the Constitution.
The plaintiff company divided into lots, squares, and streets a certain tract of,land within the limits of the city of Shreveport with a view to selling same for residential purposes. In order that the locality might be more attractive to white people, and, as a consequence, be sold to better advantage, it inserted in every act by which it sold one or more of the lots a stipulation to the effect that the sale was made “upon the following conditions, covenants and reservations of rights, which shall continue for twenty-five years from date hereof, to wit,” that the vendee agreed that he, his heirs. and assigns, should refrain from selling or leasing the lot or lots to a negro; and that, to insure the observance of this “covenant,” the company, or any owner or occupant of any of the lots in the same block, should have the right to prevent the breach thereof by an injunction, mandatory or other, and to recover whatever damages might have been suffered from any such breach; and that this “covenant” should run with the land, and should be kept by all parties occupying or using said lot or lots.
One of the sales thus made was to the defendant Cazeaux, in 1907, for a price recited in the act of sale to be $350, but which was in reality $150. Cazeaux sold the lot, in 1908, to his codefendant, a negro, and the plaintiff company at once brought this suit.
Plaintiff alleges that said clause not to sell or lease to a negro is a resolutory condition, and that this condition has been accomplished by the sale to a negro, and that plaintiff is in consequence entitled to have the said sale to Cazeaux rescinded; and plaintiff tenders back the $150 received as the price of the sale to Cazeaux.
Defendants refuse to accept the tenders, deny that said condition is resolutory in character or that, it runs with the land, aver that it creates merely a personal obligation on the part of the vendee, not binding the land, so that the land passed unburdened with it; that as an obligation running with the land it would be null, .as creating a tenure of property unknown to our laws, and doubly so as being in restraint of commerce, and therefore against the public policy of the state; and, finally, that it is null as being against the public policy of the national government, in that it discriminates against the negro race.
*727 Parol evidence was offered on the trial to prove that the real price was $150, and not $350, as recited in the act of sale. This evidence was objected to, on what ground we are not informed, but presumably on the ground that parol evidence is inadmissible for varying or contradicting the terms of a written contract. The objection was overruled.
The case has been certified to this court by the Court of Appeal of the Second Circuit, with the request that this court answer the following questions:
“(1) Does the stipulation in the deed with reference to the transfer of the property to a negro violate the Fourteenth Amendment of the Constitution of the United States for the reason set out in the exceptions filed by defendants?
“(2) Is said provision contrary to .the public policy of this state, and therefore null and void, as stated in article 7 of defendant’s answer?
“(3) Is the provision referred to a covenant or a. condition subsequent a breach of which entitles the grantor to a, rescission of the contract?
“(4) Is the plaintiff company, in view of the fact that certain specified remedies for the breach of the provision are stipulated in the deed, injunction and damages, entitled to avail itself of the additional remedy of a suit to annul for violation of a condition subsequent?
“(5) Was parol evidence admissible, as between the parties to the deed, to show that $150 was the true consideration of the sale, instead of $350, as stated in the deed, in the absence of allegations of fraud, error or ambiguity?”
Before proceeding to answer these questions specifically and analytically, we will observe, in a general way, that it would be unfortunate if our system of land tenure were so hidebound, or if the public policy of the general government or of the state were so narrow, as to render impracticable a scheme such as the one in question in this case, whereby an owner has sought to dispose of his property advantageously to himself and beneficially to the city wherein it lies. And we will observe, further, that if the stipulation against selling to a negro constitutes neither a real right nor a resolutory condition or condition subsequent, following the property into the hands of third persons, its insertion in the act has not provided adequate means of maintaining the integrity of said scheme, for the two remedies of injunction and damages would not be adequate to that end. After a sale had been made, a preventive injunction Would be too late, and a mandatory injunction could reach only Oazeaux; not his vendee, who — on the hypothesis of said stipulation not constituting a real right or a resolutory condition— would have acquired the property free of same. And the damage resulting from the integrity of the scheme being destroyed might be tenfold greater in amount than Oazeaux or his vendee might have the means of satisfying. And in the same way that Oazeaux might thus destroy said scheme, so might any one of the other vendees of the plaintiff company. Viewing therefore only in their general aspect the defendant’s contentions as covered by the questions 1, 2, and 3, we should say that those questions would have to be answered adversely to defendant.
[1] The first, because the general government has not undertaken to interfere with private rights within the states in the interest of the negro race. The fourteenth amendment, in so far as prohibiting discrimination against the negro race, applies only to state legislation, not to the contracts of individuals. Civil Rights Cases, 109 U. S. 62, 3 Sup. Ct. 18, 27 L. Ed. 835. The matter is one purely of state, or local, interest, with which the general government has no concern, and upon which therefore it can have no policy. Ex parte Plessy, 45 La. Ann. 80, 11 South. 948, 18 L. R. A. 639.
[2] To the second question we answer that, while the public policy of the state opposes the putting of property out of commerce, it at the same time favors the fullest liberty of contract (article 1764, C. C.), and the widest latitude possible in the right to dispose of one’s property as one lists (article 491, C. C.), *729 so long as no disposition is sought to be made contrary to good morals, public order, or express law. In Female Orphan Society v. Young Men’s Christian Ass’n, 119 La. 287, 44 South. 15, 12 Ann. Cas. 811, a condition of perpetual and total inalienability was held to be void as putting property out of commerce, and therefore against public policy, but between total and perpetual inalienability and partial and temporary inalienability there is a very wide difference. The insertion of a condition of the latter character in contracts and donations is a matter- of everyday occurrence, with challenge from no quarter. The question of how far such a condition will be sustained is one dependent very much upon the facts of each particular ease. If the condition is founded upon no substantial reason but merely in caprice, and is of a character to tie up property to the detriment of the public interest, it will not be sustained ; otherwise, it will. In France, whose public policy in this regard, as, indeed, in the case of every enlightened nation, is the same as ours, it has been held that perpetual and total inalienability might be imposed upon the donation of a tract of land for use as a graveyard. Carpentier et Du Saint Bep. de Droit Frangais, Yo. Condition, No. 347. And under Nos. 343-349 of this same work, the general result of the decisions of the courts and of the opinions of the jurists is summed up, as follows:
“A condition frequently imposed is that which restrains the faculty on the part of the donee or legatee to dispose of the thing given or bequeathed, either directly or indirectly, by any act between living persons or by testament. The courts have been called upon frequently to solve difficulties relative to clauses of that kind. It is a matter of public interest, it concerns the public wealth, that the circulation of property should operate freely and without hindrances. Hence all are in accord in looking upon a condition of perpetual and absolute inalienability as being against public order and illegal.
“But if the condition not to alienate is prohibited when it is absolute and perpetual in character, the same is not the case when it is relative and temporary, and when, moreover, it is justified by some serious consideration.”
At common law the rule against perpetuities is much less restrictive than that of France or ours. It allows property to be tied up for the lives in being plus 21 years. 30 Cyc. 1467. It allows perpetuity to be imposed upon a charitable gift or donation for pious use. 6 Cyc. 905. Otherwise, the rule with regard to restraints upon alienations is about the same as ours. 13 Cyc. 687.
We therefore answer this second question in the negative.
[3] Our answer to the third question, is that the said stipulation against selling or leasing to a negro is not a mere covenant or personal obligation, but is a real obligation, or, in scientific language, is a real right— a dismemberment of the ownership — and that it is a condition subsequent, or resolutory condition, the accomplishment of which has the effect of restoring matters to the situation in which they were before the contract was entered into. C. C. art. 2045.
Our brethren of the Court of Appeal have inadvertently combined in this question No. 3 two questions which have no legal or scientific or analytical, connexity, or relation with each other, namely: First, whether the said stipulation creates a personal obligation or a real obligation; and, secondly, whether it imposes a resolutory condition. The solution of these questions involves different processes of reasoning. We first address ourselves to the former.
The contract expressly declares that the said stipulation is a condition and a reservation, and that it is to run with the land; and by codal provision “(article 1901) agreements legally entered into have the effect of laws on those who have formed them,” except that “(article 11) individuals cannot by their conventions, derogate from the force of laws made for the preservation of public order or good morals,” and that “(article *731 12) whatever is done in contravention of a prohibitory law, is void.” The inquiry therefore is as to whether there is in the said stipulation anything contrary to public order or good morals or in contravention of a prohibitory law. Defendants contend that it creates a tenure of property unknown, and therefore repugnant, to our laws.
In the hereinabove cited case of Female Orphan Society v. Young Men’s Christian Ass’n, 119 La. 287, 44 South. 15, 12 Ann. Cas. 811, where a condition of perpetual inalienability was held to be void, as being contrary to the public policy which will not allow property to be taken out of commerce permanently, this court, for showing this public policy, quoted expressions of this court taken from the cases of Harper v. Stanbrough, 2 La. Ann. 381; Suc. of McCan, 48 La. Ann. 158, 19 South. 220; Suc. of Franklin, 7 La. Ann. 395; Sue. of Hernán, 52 La. Ann. 48, 26 South. 749; McDonogh Will Case, 8 La. Ann. 259; Mathurin v. Livaudais, 5 Mart. (N. S.) 302; Heirs of Cole v. Cole’s Ex’r, 7 Mart. (N. S.) 416; Arnaud v. Tarbe, 4 La. 502; and Henderson v. Rost, 5 La. Ann. 441 — on the point of the uncomplicated character, or simplicity, of oúr system of land tenure. All these expressions must be read in connection with the issue involved in the several' cases in which they are to be found, and, when so read, amount to nothing more than that trusts and perpetuities are forbidden by article 1519 et seq. of our Code. And, in like manner, what the present writer said in his concurring opinion in La. & Ark. R. R. Nav. Co. v. Winn Parish Lumber Co., at page 426 of 59 South., as to our law not having “opened the door to an unregulated brood of real rights,” must be read in connection with the matter there at issue, which was as to whether our Code allows the creation of servitudes to do — in faciendo; and, when so read, will be found to mean nothing more than what is stated in the last line of page 422 that;
“These articles show that real obligations may be created, but not that personal servitudes, other than those expressly sanctioned by the Code, can be.”
By whatever was said.in those cases, the court did mean to express the idea that an owner in selling his property-may not dismember the ownership and transfer part of it and retain the remainder. That, for instance, he cannot sell the use and retain the remainder of the ownership; or the usufruct, and retain the remainder; or that he cannot sell only part of the use, or part of the usufruct. Or that in the same manner in which he can thus separate and subdivide those elements of the ownership which are here mentioned, he may not separate and subdivide the other and remaining element — the right to dispose of.
Articles 490 and 491 of the Code declare that ownership is divided into the perfect and the imperfect. That ownership is imperfect “when it is to terminate at a certain time or on a condition; or if the thing, which is the object of it, is charged with any real right towards a third person”; and that “perfect ownership gives the right to use, to enjoy and to dispose of one’s property in the most unlimited manner.”
The manner in which one may dispose of one’s property is here said to be “most unlimited.” The expression in the corresponding article of the Code Napoleon (article 544) is “la maniére la plus absolue:” “the most absolute manner.” “Most unlimited,” not in the sense merely of the completeness and thoroughness, or absoluteness, with which the owner may divest himself of the title; but “most unlimited” in the sense of the variety of the dispositions which he may make of, and concerning, the ownership. To this variety, declares this article 491, there is no limit. In other words, one may dismember the *733 ownership ad infinitum; and dispose of each separate dismemberment as one pleases.
This freedom from restraint is confirmed at every step by the Code. For instance, article 1764 declares that:
“All things that are' not forbidden by law may legally become the subject of contract.”
And article 2013 that:
“The real obligation, created by condition annexed to the alienation of real property, is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law.”
And article 709 that:
“Owners have the right to establish on their estates, or in favor of their estates, such servitudes as they deem proper; provided that the services be not imposed on the person or in favor of the person, but only on an estate or in favor of an estate; and provided, moreover, that such services imply nothing contrary to public order.”
The declaration of article 491 that the owner may dispose of his property “in the most unlimited manner” is qualified by the addition, “provided it is not used in any way prohibited by laws or ordinances”; and, as a matter of course, it is further qualified by the fundamental principles that the disposition must have in it nothing contrary to public order or public policy or good morals. But, in the absence of any objection of that kind, nothing will be found in the letter or in the spirit of our law to prevent an owner from making what disposition he pleases of his property.
This question of the right to dismember the ownership otherwise than in the modes expressly recognized by the Code is a much discussed one in the jurisprudence of France. On that poiiit, Demolombe, Distinction des Biens, vol. 9, p. 454, No. 513, expressing the prevailing view, in which, by the way, he himself does not concur, says:
“The general opinion is that the articles of the Code Napoleon which determine the rights that one can have on property are not limitative, and that individuals are at liberty to create (encore et en outre) over and beyond them all the dismemberments it may please them to adopt, and to make in-their property every possible (cisaillements) shearing according to the expression of Boularic.
“Here, for example, is how Toullier expresses himself:
“ ‘If it is asked what rights may be separated from perfect ownership, in how many ways it may be dismembered, the principle must first be laid down that every one may dispose of his ownership in the most absolute manner (article 544); he may detach from it such rights as he deems proper, extend or restrict these rights as he pleases; in a word, dismember his ownership just as he deems proper, provided there be nothing contrary to good morals or public order. Hence, in this matter, the general principle is followed, that whatever is not prohibited is permitted.’
“And this same principle is found to be formulated with the same generality of expression in the monuments of jurisprudence. Thus—
“ ‘Considering that, in law, articles 544, 546 and 552 of the Code Napoleon are declarative of common right relatively to the nature and effect of ownership, but are not prohibitive; and that neither these articles nor any other law exclude the various modifications and decompositions of which the ordinary right of ownership is susceptible.’ Cassation, 13 Feb. 1834, Coquelard, D., 1834, 1, 118.
“ ‘Considering that the transmission of the ownership is susceptible of all such stipulations and conditions as have nothing in them contrary to the laws, or to good morals or public order.’ Amiens, 2 Dec. 1835, Bezanne, D., 1838, 21, 198.”
Demolombe, for bis dissent from the views thus expressed, is criticized by Laurent, Droits Béels et Personnels, vol. 9, p. 110, No. 84, as follows:
“Mr. Demolombe takes advantage of the principle established by' article 6” (article 11 of our Code) “and applied by article 686” (our article 709) “to maintain that real rights pertain to public order, and that consequently the creation of any other than those consecrated by the Code would be in derogation of public order. He bases this doctrine upon a very singular definition of the laws that concern public order. ‘Evidently,’ says he, ‘there must be classed among these laws all those which concern third persons or the public, or the security of agreements, or the modes of transmitting property. Now, the law which determines and organizes the real rights of which property is susceptible, concerns, beyond any doubt, in the highest degree third persons, the public, the mode of transmitting property and the security of agreements. Therefore it is a law of public order; hence individuals cannot change it; hence, such a law must necessarily be considered as bping limitative in the enumeration of the real rights which it recognizes.’ To this reasoning only one thing *735 is lacking, and that is the proof of the proposition upon which it rests. Where, either in our laws or in tradition, is it said that the words ‘public order’ signify what Mr. Demoloinbe makes them express? It is so evidently a definition invented for the needs of the argument that it is useless to refute it; do we refute mere fanciful notions? All. that need be said is that the words ‘public order’ have a wider meaning than,this in doctrine and in legislation ; individuals have never been. allowed to derogate from the laws which concern the public interest. The discussion resolves itself then into this: Does it concern the public interest that the owner should be limited in the use which he wishes to make of his property, when he establishes some real right of whatever kind? The answer must be yes, if the real right trenches upon the liberty of person and property established by the Assemblée Constituante. The answer must be no, whenever the agreement of the parties has for its object only their private interest.”
This question is precisely the same under the Code Napoleon as under ours, for the system of land tenure under the two codes is the same. Our Code adopted bodily that of the Code Napoleon. The discussions of this question under the Code Napoleon are therefore entirely apposite under our Code,
In Heirs of Delogny v. Mercer, 43 La. Ann. 205. 8 South. 903, where the owner sold a row of lots and bound himself to leave free to the common use of the purchasers a certain space upon which all the lots fronted, without any right on the part of these purchasers ever to enjoy or dispose of said open space, the title to this open space was held not to have passed to the public by destination, aud not to have been transferred to the purchasers, and yet to have passed out of the vendor.
In De Grilleau v. Frawley, 48 La. Ann. 184, 19 South. 151, the owner retained the ownership of an alley in the city of New Orleans, while conveying the perpetual use of it to the owners of the contiguous property.
And in Voinche v. Town of Marksville, 124 La. 712, 50 South. 662, where property had been donated affected to a particular use, and the lower court had held that “a donor, like a seller, cannot limit the uses of the property when he parts with the ownership,” this court quoted and applied article 1527 of the Code, which reads:
“The donor may impose on the donee any charges or conditions he pleases, provided they contain nothing contrary to law or good morals.”
As stated by article 491 of the Code, ownership is composed of the rights to use, to enjoy, and to dispose of. These three constituent elements of the ownership bear in the civil law the designation given to them in the Roman law: The usus, the fructus, and the abusus. The two first of these elements, the use and the usufruct, are admittedly susceptible of separation from the other elements and of subdivision after having been segregated; why then is not the third, the abusus, or right to dispose of, susceptible of being dealt with in like manner? The fact of the matter is that such subdividing of the right to dispose of is exemplified by every contract by which a restriction of any kind is placed upon the right to dispose of property. A condition in a sale that the property sold shall be used only in a particular way, or shall not be used in some other particular way, is of everyday occurrence; and no one has ever doubted the validity of such a condition, if merely temporary. The right to alienate is but one of the constituent elements of the right to dispose of; and in the same way that the ownership may be subdivided, and the usus, and the fructus and the abusus may be subdivided, so may this right to alienate, a subdivision of the abusus, be, in turn, subdivided. And that is what the said stipulation in question in this case amounts to in effect. By it the right to alienate is subdivided, and only a part of it is transferred to Cazeaux. There is withheld from him that part of the right to alienate by which, if he had acquired the full right to alienate, he would have been enabled to sell to a negro. *737 This right thus withheld from him is part of the ownership; a dismemberment of it; just as the usus is, or a dismemberment of it would be; or the usufruct is, or a dismemberment of it would be; or the abusus is, or any other dismemberment of it would be. Hence, our answering that the said stipulation by which said right is reserved from the sale or, in other words, is withheld from the vendee, Cazeaux, does not create a mere personal obligation,. or “covenant,” as our brethren term it in their question, but creates a real obligation. Cazeaux, not having acquired this right, could not exercise it; one cannot exercise a right one has not; and his attempt to do so is productive of no legal result as against the plaintiff company and perhaps also as against the occupants of the other lots for whose benefit, by way of a sort of stipulation pour autrui, the reservation was made. We say “perhaps,” because if these occupants of the other lots in the subdivision were the parties plaintiff in the suit, and were the sole plaintiffs, it would seem as if they might not have the right to rescind the sale to Cazeaux, that right not having been expressly reserved to them, or stipulated in their favor, in the sale to Cazeaux, and it not arising in their favor by implication, they not having been parties to the contract. Their remedy would seem to have to be restricted to injunction (mandatory and other) and damages, as stipulated in the contract. How far that remedy could be extended might present a difficult question.
[4] We pass now 'to the question whether the condition imposed by the said stipulation is resolutory in character. The question of when a condition is resolutory in character is not always easy of determination. The payment of the price in a contract of sale is admittedly so. Pothier, de la Vente, No. 476, after speaking of the nonpayment of the price, proceeds as follows:
“With regard to all the other obligations either of the seller .or of the purchaser, it is by the circumstances that we must. determine whether their inexecution gives rise to the rescission of the contract; it gives rise to the dissolution of the contract when the thing promised is such that I would not have been willing to contract without it.”
See, also, Laurent, Principes de Droit Civil, Obli. Con. vol. 17, p. 142, No. 127.
In the present case, even the payment of the price might have been less important to the plaintiff company than the observance of this condition, since the price of this lot might have amounted to less than the extent to which the value of all the other lots might have been diminished by the breach of this condition.
This stipulation was an essential feature in the scheme of the company; therefore, obviously, the company would not have been willing to enter into the contract without it, and, as a consequence, it constitutes a resolutory condition or condition subsequent in the contract.
[5] The defendant Cazeaux may be able, however, to obtain from his vendee a cancellation of the sale by which this condition has been breached, and may prefer to do so rather than have the sale by the company to himself dissolved. The property may, perhaps, have increased in value. The court is at liberty, in its discretion, to grant him time in which to do this, and thereby avoid a dissolution of the sale. C. C.. art. 2046, 2047.
[6] The fourth question is answered by article 1962 of the Code, which provides:
“When a contract contains general obligations, and the parties, in order to avoid a doubt whether a particular case comes within the scope of the agreement, have made special provision for such case, the general terms of the contract shall not on this account be restricted to the single case that is provided for.”
Defendant has submitted no brief, and cases of this kind are not orally argued in this court; but we assume that the conten *739 tion that by providing in their contract these particular remedies of injunction and damages the parties intended that these remedies should be exclusive is sought to be sustained by the argument inclusio unius est ex-clusio alterius. We make this assumption, as our mind suggests no other reason that could be adduced in support of said contention. Thé argument is strong; so much so, indeed, that the article of the Code just quoted was adopted for the very purpose of defeating it See Marcade on article 1164, O. N.
[7] On the question of the admissibility of parol evidence to show that the real price was $150, and not $350 as stated in the act, we answer in the affirmative. The purpose of the offer is not to defeat the contract. The defeat of the contract will result, if at all, not from the admission of this parol evidence, but from t-he breaéh of the condition of nonalienability. The purpose of the offer is simply to show what amount was received from Cazeaux and should be refunded to him. From that standpoint, the recital in the deed that the amount received was $350 is in reality nothing more than a receipt, and has no greater legal effect (Wig-more, Bv. par. 2433); and a receipt is always open to oral explanation (Id. 1058).
O’NIELL, J., dissents from the opinion that the condition runs with the land.