STANLEY A. HARVEY, Appellant, vs. LOUIS MOUNCOU

(December 14, 1925, Opinion and Decree)

(*Syllabus by the Court.*)

1. **Louisiana Digest—Evidence—Par. 261, 263.**

Parol evidence cannot be admitted to vary the terms of a written contract, but a subsequent oral agreement altering, waiving, discharging or otherwise novating a prior transaction cannot be excluded because of the prior transaction having been reduced to writing.

2. **Louisiana Digest—Estoppel—Par. 34.**

Where the parties to a written contract subsequently enter into a verbal agreement abrogating the written contract, they will be estopped to deny the oral contract and cannot object to its introduction in evidence upon the ground that it is an attempt to vary the terms of the written contract by parol. The parol evidence rule has no application.

Appeal from Civil District Court, Hon. Hugh C. Cage, Judge.

This is a suit for the collection of a commission due for the sale of a certain piece of real estate belonging to the defendant. There was judgment for the defendant and plaintiff appealed.

Judgment reversed and remanded.

Woodville & Woodville, of New Orleans, attorneys for plaintiff, appellant.

John D. Nix, Jr., and W. W. Wright, of New Orleans, attorneys for defendant, appellee.

WESTERFIELD, J. Plaintiff, a real estate agent, sues the defendant for $300.00 as a commission upon the sale of a certain piece of real estate, belonging to defendant, alleging a written agreement entitling him to the amount claimed.

Defendant admits employing defendant to sell his property under the written agreement setup by plaintiff but avers that plaintiff's authority to sell his property and the written agreement between them was subsequently revoked by mutual consent long before the sale of the property.

There was judgment as prayed for and defendant has appealed.

The contract sued on describes the property listed for sale with plaintiff and stipulates that plaintiff as agent shall receive five per cent commission upon such amount as the property sells for; the agent is given full control of the property and the defendant as owner agrees not to interfere and to refer all prospective purchasers to the agent. In a word, the plain intent is that the agent shall have a commission if the property is sold during the term of the contract no matter how sold or by whom, and the owner agrees that "I will notify my agent in writing and give him ninety days notice if I desire this contract discontinued". There was proof by plaintiff that the property was sold, though not by plaintiff, yet under circumstances entitling plaintiff to a commission if the contract sued on was still in force at the time of the sale. It is admitted that no written notice was given plaintiff by defendant of defendant's desire to terminate the agreement as required by the terms of the contract. Defendant offered to show by parol that the provision of the contract requiring ninety days' written notice of withdrawal by defendant had been waived by mutual agreement, but upon objection of counsel this evidence was excluded upon the ground that its effect would be to vary the terms of a written contract. The point presented for our decision by this appeal is the correctness of this ruling of the learned judge a quo.

The rule applied is of ancient origin and of unquestionable authority though it was

once otherwise. We quote the following interesting statement of Mr. Wigmore:

"In the primitive Germanic notions at the time of the barbarian invasions and under the Merovingian and Corlovingian monarchies, there was certainly no notion of the indisputability of the terms of a document. This is explained, and was indeed predetermined by the character of the civilization of those peoples. When the Germanic tribes spread west and south, and absorbed the Roman territories in Gaul, Spain and Northern Italy, they brought with them two marked traits—an ignorance of letters and a legal system of formal and oral transactions. They found writing in use among the Romanized peoples and (in Italy at least) an advanced habit of transaction by notarial documents, and this they, in part, fell in with. But it remained alien to their own ideas; and after the dissolution of the Corlovingian Empire and the subsidence of the Romanesque influence (say by the 900's) the alien element that found entrance was excised and the development of their native system proceeded on its own main lines. The document, then, even in its most definite type (carta) is, in the Germanic system, merely one of the symbols that entered into the formalism of the transaction, and like the wand, the glove and the knife, has an efficacy independent of its written tenor—which indeed could mean nothing to the parties who employed it.

"In this stage then the 'carta' merely plays a convenient part, first, by enabling the formal delivery of the land to be made symbolically away from the premises and next by preserving against future forgetfulness the names of the witnesses."

Proof at this period of development was made by the witnesses who freely contradicted the terms of the writing if opposed to their recollection of the transaction.

The beginning of the modern doctrine is co-eval with the introduction of the seal. To quote again from Mr. Wigmore, "the legal value of the seal was the result of a practice working from above downwards, from the king to the people at large. It is involved in the beginning with the Germanic principle that the king's word is in-

disputable. Who gives him the lie forfeits life. The king's seal to a document makes the truth of the document incontestible. * * * As the habitual use of the seal extended downwards its valuable attributes go with it. First a few counts and bishops acquite seals; and then their courtesies are sought in lending the impress and guarantee of their seals to some document of an inferior person. Finally the ordinary freeman comes usually to have a seal and his seal, too, makes a document indisputable—at least by himself."

The seal was also very useful in other respects. The great charter of Runnymede bears the picturesque seals of the barons who would otherwise not be parties to the instrument since they could not write. The indisputable character of documents under seal and the popular feeling in reference thereto is well illustrated by the greatest of lay writers on Henry IV:

"Dick: The first thing we do let's kill all the lawyers.
"Cade: Nay, that I mean to do. Is not this a lamentable thing, that the skin of an innocent lamb should be made parchment, that parchment being scribbled o'er should undo a man? Some say the bee stings; but I say 'tis the bee's wax, for I did but seal once to a thing and I was never mine own man since."
(Wigmore, Vol. V, p. 297.)

The history of the rule to which we have adverted at length indicates that considerations of convenience largely influenced its development. Its first service in permitting the symbolical delivery of land and dispensing with livery of seizin and as a record of the names of the witnesses who were in no sense controlled by the terms of the document, was one of convenience. In its highest expression as "where a jural act is embodied in a single memorial, all other utterances of the parties on that topic are legally immaterial

for the purpose of determining what are the terms of their act" is largely practical. There is nothing sacrosanct about a paper writing which invests it with solemnity and prevents its modification under some prescribed formalism. It may not be opposed unilaterally by parol. Neither plaintiff nor defendant could be heard in an effort to prove any variance of its terms. It cannot be contradicted by oral evidence. This is and has been the rule for centuries. But oral testimony may be admitted to prove a subsequent agreement modifying or abrogating its terms. In that case the question is whether the subsequent convention or agreement is in proper form and if so it is admissible not to vary the written contract but as proof of another contract. The principle of law controlling in this situation has no relation to the parol evidence rule but is based upon estoppel. A privy to an agrement can not be heard to deny his connection therewith. To use a simple illustration, if A sells his horse to B and the transaction is reduced to writing and thereafter B, becoming dissatisfied with his purchase, enters into a verbal agreement with A whereby the horse is returned to A under conditions mutually satisfactory, the second transaction whereby A reacquires the horse is just as valid in law as the first since there is no requirement that the sale of personal property be in writing, and there can be no doubt of its being susceptible of oral proof notwithstanding its negation of the written evidence in the first contract as to the ownership of the horse.

"The general rule now under consideration rests on the assumption that a specific transaction has been embodied exclusively in a single document. All distinct and separate transactions may therefore be established and availed of whenever they are in themselves valid. Now a transaction subsequent in time must always be a separate transaction. The rule of exclusion can only apply to negotiations contemporaneous in time, or prior but incomplete. Where a document, for example, is executed on July 1, it may be held to embody the final and exclusive result of negotiations before and up to the time of execution; but a transaction on August 1 must be a separate one and therefore can never be excluded so far as the effect of the document of July 1 is concerned. It may be that some rule of form will sometimes make the transaction of August 1 invalid in itself; as when a writing is required by the statute of frauds, or where a parol release will not discharge a sealed contract; or when an agreement not to sue will not be enforced at common law. But the present rule can interpose no obstacle.

"In particular any subsequent agreement waiving, discharging or otherwise novating a prior transaction is not excluded by reason of the prior transaction having been reduced to writing."

Wigmore, Vol. V, Verbo Parol Evidence Rule, p. 330.

Reference to the following Louisiana authorities collectively establishes the principle here announced though no single case tells the whole story any more than a single stone reveals the design in a mosaic:

Page vs. Nicholson & Co., 27 La. Ann. 116.

Monarch vs. Board of Com'rs of McDonogh School Fund of City of New Orleans, 49 La. Ann. 991, 22 South. 259.

Crook vs. Tensas Basin Levee Dist., 51 La. Ann. 286, 25 South. 88.

Brink vs. Bartlett, 105 La. Ann. 336, 29 South. 958.

Selby vs. City of New Orleans, 119 La. 900, 44 South. 722.

Wellman vs. Smith, 114 La. 230, 38 South. 151.

Queensborough Land Co. vs. Cazeaux, 136 La. 724, 67 South. 641.

O'Leary vs. Board of Port Com'rs for Port of New Orleans, 150 La. 649, 91 South. 139.

We find the principle applied in building contracts and we select the following authorities from other states and from the federal courts:

"Where a contract for alteration and repair of a vessel provided that the contractor should make no claim for extra work unless he could show a written order for the work and written approval of the designers and the price, and that no verbal agreement and order of any of the parties or their agents should be claimed by either party to modify the clause, and no waiver thereof not in writing and signed by the parties should have any force, allowances should not be made for extra work based upon verbal agreements unless on proof so clear and convincing as to leave no doubt as to the intention of the parties to waive the contract provision and substitute an oral agreement therefor."

James Reilly Repair and Supply Co. v. Smith, 177 F. 168.

In Jefferson Hotel Co. vs. Brumbaugh, 168 Fed. 867, it was held that where the owner retained possession and the enjoyment without protest of extras orally ordered of the contractor by the superintendent, the owner was estopped to deny the general authority of the superintendent to give the order, and the contract provision that all extras should be ordered in writing was waived.

In Theis vs. Svoboda, 166 Ill. App. 20, the court held that notwithstanding a building contract provides that all extras must be ordered in writing, the owner may waive such provision, and if he orders extras verbally he is liable therefor.

In McGowan vs. Gate City Malt Co., 150 N. W. 965, it was decided that a subcontractor could recover for extra work verbally ordered notwithstanding a provision of the sub-contract to the effect that "no work done or material furnished by the sub-contractor should be considered as extra or paid for as such unless a separate agreement in writing therefor should be made before the commencement of such work or furnishing of such material".

"A written contract to repair a building according to specifications may be modified by a subsequent parol contract for extra work." Derrico vs. Muller, 142 N. Y. 5479.

In Pierce vs. Powers, 180 Ill. App. 687, it was held that the parties may waive the conditions in a contract under seal by parol and when so waived the conditions are abrogated.

In Becker vs. Becker (Ill.), 95 N. E. 70, it was held that: "A waiver of a covenant by the party for whose benefit it is inserted into a written instrument may be made by parol and such waiver is held not to be a modification or change in the terms of the original agreement".

Our conclusions are that the judge a quo erred in excluding the oral testimony offered in support of defendant's case and that consequently the case must be remanded for the purpose of admitting and considering the rejected testimony.

For the reasons assigned the judgment appealed from is reversed and this cause is remanded for further proceedings according to law and consistent with the views herein expressed.