[Civ. No. 6126. First Appellate District, Division Two.—April 2, 1928.]

LOUISA JEWETT et al., Respondents, v. GEORGE H. ALBIN et al., Appellants.

Frank P. Doherty, A. C. Routhe, B. Zum Brunnen, Shepard Mitchell and Leslie E. Clawson for Appellants.

Tanner, Odell & Taft and Fred H. Taft for Respondents.

KOFORD, P. J.—Before stating the facts of this case we will first consider respondents' motion to dismiss the appeal. This motion is based upon the claim that the proposed bill of exceptions was not presented in time and that the notice of appeal was not filed in time.

■ The trial was had without a jury and resulted in a judgment for plaintiffs which was entered November 21, 1924. On November 24 respondents served on appellants a written notice that the findings and judgment in favor of plaintiffs were *signed* and *filed* November 20, 1924. Appellants on December 1, 1924, served and filed their notice of intention to move for a new trial. On January 23, 1925, respondents served notice of *entry* of judgment. On March 17, 1925, the motion for a new trial was presented and denied. This was within two months from the service of the notice of entry of judgment on January 23, 1925, but much more than two months from November 24, 1919, when notice was given that findings and judgment had been filed. Thereafter on March 27th, within ten days after the order denying a new trial, notice of appeal was served and filed. On May 19, 1925, the proposed bill of exceptions was served upon respondents. It is not claimed that the proposed bill of exceptions was served too long after March 17th, the day on which the motion for a new trial was actually denied, but that it, as well as the notice of appeal, should have been served and filed respectively within ten days and two months after notice of filing of judgment and findings November 24, 1924, or at least within that length of time after December 1, 1924, when notice of intention to move for a new trial was served and filed. It is claimed that the notice of intention was a waiver of notice of entry of judgment and therefore the time within which the court had power under Code of Civil Procedure, section 660, to pass on the motion for a new trial commenced running at that time. The decisions are to the contrary, holding that the two months' period commences to run only from the time expressly stated in Code of Civil Procedure, section 660. (*Moore* v. *Strayer*, 175 Cal. 171 [165 Pac. 530]; *Strehlow* v. *Mothorn*, 197 Cal. 112 [239 Pac. 850]; *Hutton* v. *Chapman*, 197 Cal. 288 [240 Pac. 764].)

Respondents rely on *Prothero* v. *Superior Court*, 196 Cal. 439 [238 Pac. 357], which holds that actual notice of entry of judgment starts running the ten days' time in which a notice of intention to move for a new trial must be made under Code of Civil Procedure, section 659. The question here raised, however, relates to the limitation of time on the

power of the court to pass on a motion for a new trial as provided in Code of Civil Procedure, section 660, and not to the time within which the notice of intention to move for a new trial must be given under Code of Civil Procedure, section 659. In *Strehlow* v. *Mothorn, supra,* a distinction is pointed out between a limitation upon the power of the court and a limitation upon the right of a party to move for a new trial. It should also be noticed that Code of Civil Procedure, section 660, says "after . . . service on the moving party of notice of the entry of judgment," while section 659 of the Code of Civil Procedure, says "after receiving notice of the entry of judgment." One may receive notice by obtaining knowledge without service, but is not served with notice by obtaining actual knowledge.

Respondents' points raised against the perfecting of the appeal are therefore not well taken.

The plaintiff in this action, respondents here, obtained a permanent injunction against appellants based on building restrictions contained in deeds by which a tract of land called Westmoreland tract, was originally conveyed to the several lot owners.

The judgment decreed that all the restrictions were valid and subsisting and inured to the benefit of plaintiffs and all other lot owners in the tract. It enjoined all the defendants "from using any lot (in the tract) or the structures or buildings on said lots, as a rooming house or boarding house or apartment house or for any business, calling or occupation *other than as a residence for a single family"* and from violating any of said restrictions.

One of appellants' contentions which involves an interpretation of the restrictions is that whatever relief might be properly granted in equity against *construction* of an apartment house, its *use* as such was not actually prohibited by the restrictions and that the restrictions do not limit buildings to use of a single family. The restrictions follow:

"1st. The property hereby conveyed shall be used for residence purposes exclusively and no building or structure pertaining to or for the conduct of business of any kind whatsoever shall ever be erected thereon.

"2nd. No residence of less than two full stories above the basement shall be erected or placed upon said premises,

and no residence shall be erected or placed upon said premises that shall cost less than four thousand dollars ($4,000.00).

"3rd. The residence to be built . . . shall"—certain setback lines established, not involved here.

"4th. Prescribes height of fences not involved here.

"5th. No more than one residence shall ever be erected or placed," etc.

"6th. No double or tenement houses or flats nor any kind of a residence except a residence designed for use as a single residence, shall ever be erected or placed upon the premises hereby conveyed.

"7th. No oil well, etc.

"Upon a breach of either or any one of the foregoing conditions, the title to said property hereby conveyed and to the whole thereof shall become at once divested from the second party herein, his heirs or assigns and shall revert to and revest in the parties of the first part, their heirs or assigns.

"It is further agreed by the parties hereto that the premises hereby conveyed are part of a tract intended to be used exclusively as a first class residence property, and it is agreed that the conditions hereinbefore recited are intended for and are for the benefit of the remainder of said tract and of the owners thereof, and that a breach of any one of said conditions may be enjoined or prevented by any person owning any property in the tract of which this is a parcel."

Clark and Bryan opened the tract in 1903 or between 1901 and 1903, and deeds each containing the same conditions and restrictions were executed by them to the various purchasers of lots in the tract. The restrictions have no time limit. Defendants Albin eventually became the owners of lot No. 21 upon which was situated a dwelling-house. In May, 1923, the defendants Albin obtained a building permit to rebuild the said residence into an eight-family apartment house and commencing on May 16, 1923, vigorously prosecuted the work. Their certificate of title obtained allowed it. The city zoning ordinance allowed it. A first mortgage was obtained for $28,000 and defendants proceeded to make improvements which are said to be valued at between $65,000 and $85,000. The Albins had also obtained

a quitclaim deed to their lot No. 21 from the original owners, Clark and Bryan, conveying the reversionary interest described in the original deeds. On August 2, 1923, when the improvements had progressed to a point where the building was ready to receive the exterior coat of stucco, the several plaintiffs, who owned and occupied five lots in the tract, commenced this action against defendants Albin and against the owners of 14 other lots in the tract who were alleged to have threatened to or to have actually been violating the restrictions in one way or another. Before the judgment was obtained defendants Albin had completed the improvements at least as to outward appearances.

The complaint, besides the charges against the Albins, alleged that the owners of other designated lots threatened to conduct rooming and boarding houses; that an owner of another lot had permitted the running of a school for defective children and threatened to continue; and that another owner had conducted and threatened to continue to conduct an apartment house. As to those defendants who were alleged to have threatened, the evidence in the case showed that they had actually done the things alleged to have been threatened, although the court's findings only go as far as the allegations of the complaint. These violations set forth from the evidence are as follows:

Lot 16 owned by appellant Dudley; used as a rooming-house for two years at least.

Lot 15 owned by appellant Wyche; used as a rooming-house with signs advertising that fact displayed in front of it, for about three or four years.

Lot 12 owned by appellant Taylor; used as a rooming-house for two or three years, displays signs advertising that fact. Was formerly used for certain church activities.

Lot 18 owned by appellant Ralphs; used for several years as a school for feeble-minded children.

Lot 19 owned by appellant Poland; apartment house operating for about three years.

Lot 24, 25 owned by appellant Walsh; boarding and rooming house, 25 to 30 roomers and boarders.

Lot 53. Rents rooms.

Lot 63. Apartment house; sign advertising that fact displayed on premises.

Lot 62 owned by appellant Cain or by appellant Parlan; used as an apartment house or rooming-house, displays sign advertising this fact. Originally built 20 years ago as a double or duplex residence, for past 12 years used as a rooming-house.

Lot 65 owned by Hamlin; used as a rooming-house.

Lot 90 owned by appellant Young; rented to occasional roomers.

Lot 96 owned by appellant Halldin; used as a boarding-house; displays sign; formerly used as a fraternity house.

Lot 105 owned by appellant Peck; rents to roomers. (Not a single residence.)

Appellants contend that the judgment grants to the plaintiffs greater rights than the deed restrictions provide. Numerous authorities are cited which hold that an apartment house is a building used for residence purposes exclusively and it is argued that therefore the Albins' apartment house does not violate the clause in restriction No. 1, which states that the property conveyed "shall be used for residence purposes exclusively." The only other clause in the deed which refers to use of a building as distinguished from the construction and erection of a building is that contained in the last paragraph of the deed which is not numbered nor referred to as a restriction but is in the form of an agreement as to the intention of the original parties. This clause states that the tract is "intended to be used exclusively as a first class residence property." Authorities are also cited to the effect that this clause is not violated by an apartment house. Restriction No. 6 prohibits the erection of an apartment house or a residence not "designed for use as a single residence." Appellants urge that this clause does not prescribe the use to be made of a building after erected, especially if its outward appearance conforms to the building restrictions; that such deed restrictions are strictly construed; and that the judgment here went further than is authorized by the deed in enjoining the use of the buildings of the Albins and of other defendants. It is specially urged on behalf of all the appellants that the injunction by limiting the use of the buildings of all of the defendants to "a residence for a single family" interpolated into the deed a condition which is not to be found therein.

The foregoing contentions affect differently the several defendants in this case. Their actions complained of include running of a boarding-house, of an apartment house, renting rooms, conducting a school, erecting and occupying a duplex house, and erecting and using an apartment house. Most, but not all, of the buildings so used were originally designed and built for a single dwelling or residence. The contentions made, and above outlined, might be good as to some appellants and not to others because of the diversity of conditions affecting them.

It is further contended that the plaintiffs have waived the benefits of the restrictions by their long acquiescence in the many violations of them over a period of years without protest and also that plaintiffs are guilty of laches, particularly with respect to the Albins in that building operations were openly and actively carried on under an apartment house permit, duly posted, for almost two months before any objection was raised, appellants in the meantime expending a large amount of money, some of which was lent by Brunnen, mortgagee, intervener, and appellant. Some of the plaintiffs were called as witnesses at the trial by the defendants and examined in respect to the extent of their knowledge of the several violations of the restrictions which had taken place in the tract and in respect to the erection of the Albin apartment house. But not all the plaintiffs were so examined, some of them did not appear at all at the trial. These points therefore would not be available to the appellants with equal force with respect to all of the plaintiffs, even though available as to those plaintiffs who appeared and were examined at the trial, unless it must be inferred from the nature of the various violations of the restrictions that plaintiffs knew of them. Proof of waiver must include proof of knowledge of the facts upon which the waiver is based.

In connection with their point of waiver, appellants contend that the trial court erred in making findings against their defense, that conditions in the neighborhood of the tract and in the tract itself had so changed during the twenty-two years which had elapsed since the opening of the tract of 1903 until the time of trial that a court of equity should not grant equitable relief to the plaintiffs.

This defense is one which is available to all of the appellants and against all of the plaintiffs alike. It amounts to an attack upon the findings of the trial court.

All of the evidence upon the issue of the changed conditions in the tract and in the neighborhood of the tract was offered by the defendants. The cross-examination of these witnesses did not materially qualify their evidence on this issue. No rebuttal on this issue was offered by the plaintiffs. The evidence on this issue is without conflict. The record, therefore, does not present a case of findings made upon conflicting evidence, but, on the other hand, the findings are supportable only in case the evidence offered is insufficient as a matter of law to support findings upon this issue in favor of the defendants.

The evidence in the transcript touching upon this point follows: The tract is bounded on the north by Tenth Street, on the south by Eleventh Street and on the east by Hoover Street. Three streets run north and south through the tract, being Elden Avenue near the west followed by Magnolia Avenue and Arapahoe Street. The tract is comparatively small, being a strip three and one-half blocks long containing 56 lots in all. It was stipulated that Tenth Street, bounding the tract on the north, had been ordered widened by the city council, making it a 100-foot boulevard and a main traffic artery. Some of the plaintiffs were called as witnesses by the defendants. The testimony they gave related to the extent of their knowledge of the various violations of the building restrictions which had taken place in the tract and not to the point under discussion. This testimony contained some admissions of knowledge and some denials and testimony from which the inference might or might not be drawn that they had knowledge of these violations by their general knowledge gained in going to and from their homes and over the streets in the tract. One of these plaintiffs lived diagonally across the street from the Albins' lot.

The defendant Albin testified. He bought lot No. 21 in 1917. He narrated his negotiations leading up to the construction of the apartment house; his investigation of the title; his securing a loan; his visit to the building department of the city of Los Angeles; and his information that the dis-

trict had been zoned under the city ordinance so as to permit apartment houses. He described the activities connected with the construction of the building in a way which was obviously intended by his counsel to establish the inference that the neighborhood well knew what the nature of the structure he was building was to be. He said he had made repeated efforts to sell the lot, that it apparently had no value. He estimated the value of the lot according to the tax receipt at $5,000; the value of the completed apartment house at $85,000 and stated the total encumbrances were $36,000. He described the several violations of the restrictions in the tract which are above set forth.

Witness Clark, one of the original subdividers of the tract, testified that he bought the property in 1901; that it was then a pasturage and the Los Angeles city limits then ended on the east side of Hoover Street; that he subdivided other tracts which adjoined this tract both on the north and on the south side in about 1898 and in 1901. These tracts were originally used for residential purposes. One of them went into business about 10 years afterward.

Witness Walsh, one of the defendants, a real estate broker, testified that the only demand for lots in the tract for residential purposes was purely to move an old house on. He described the character of the surrounding neighborhood in adjacent tracts. He said Hoover Street, beginning at Ninth Street and down to Pico, is used for gas stations, stores, apartment houses, rooming-houses, and boarding-houses. Pico is entirely for business. Ninth and Hoover is a business center, with stores and garages. Pico from Hoover Street straight through westward has old houses. East of Hoover Street is used for stores for quite a distance and inside property for multiple dwelling houses, apartment houses and flats. He further testified that the plan to make Tenth Street a boulevard had the effect of discouraging people from owning single residences on account of pending assessments. He said the property on the south side of Eleventh Street, known as the Lone Star tract, was used for apartment houses and flats. South of Eleventh Street the Lone Star tract has eight or nine apartments and many flats. The Pico frontage is entirely used for stores and garages. North of Tenth and west of Hoover is used for

flats, apartments, boarding-houses, rooming-houses, and stores. He estimated the value of the Albins apartment house at $60,000. From one side view and from the front view it did not appear to be an apartment house, but from another side looking down the driveway it could be seen that it was an apartment house from outward appearances. He also testified concerning some of the violations within this tract which are set forth hereinabove. He said the property to the north of the tract was not exclusively residential, that there were three art schools on Magnolia and that there were two or three clubs, a good many boarding and rooming-houses and some houses remodeled for apartments. His own lots within the tract at the corner of Arapahoe and Tenth Streets were leased as a boarding-house and had been so for about a year.

Witness Whatnall, director of city planning of the city of Los Angeles, testified that he had made a study of the neighborhood before the zoning ordinance was passed. Objection to much of his testimony was sustained. It related to the reasons and considerations which entered into the city planning and zoning ordinances. He stated, however, that the ordinance was based on the then existing uses in the vicinity. He described the Tenth Street boulevard project as including other streets and extending from the city limits, Miles Avenue, east to the Country Club Boulevard, thence easterly to the Los Angeles High School, practically from the east to the west side. The zoning ordinance, as he testified, zoned Tenth Street as business and the remainder of the Westmoreland tract as for multiple dwellings.

Defendant Cain testified that he had owned lot 62 in the tract for twenty-one years and that upon purchasing it he had erected a duplex or double residence which had been occupied as separate apartments, one by his own family and one by his mother's family.

In *Downs* v. *Kroeger*, 200 Cal. 743 [254 Pac. 1101], the supreme court sustained the action of the trial court in withholding equitable relief against violations of deed restrictions upon the ground that changes in conditions occurring since the restrictions were created made the enforcement of such restrictions unjust and inequitable. *Jackson* v. *Stevenson*, 156 Mass. 496 [32 Am. St. Rep. 476, 31 N. E.

691]; *Trustees* v. *Thacker*, 87 N. Y. 311 [41 Am. Rep. 365]; *McClure* v. *Leaycraft*, 183 N. Y. 36 [5 Ann. Cas. 45, 75 N. E. 961], are therein cited and quoted with approval upon this doctrine. The doctrine is also recognized and stated in *Miles* v. *Clark*, 44 Cal. App. 539 [187 Pac. 167], and in Pomeroy's Equity Jurisprudence, 4th edition, footnote under section 1295, and was applied in connection with abandonment and waiver in *Los Angeles Terminal Land Co.* v. *Muir and S. P. R. R. Co.*, 136 Cal. 36 [68 Pac. 308].

The evidence in the instant case shows changed conditions in the neighborhood of the tract to even a greater extent than that reviewed in *Downs* v. *Kroeger, supra,* and in addition shows changed conditions in the tract itself. The tract is much smaller and therefore much less capable of maintaining singly its exclusive character. The period of time which has elapsed is much greater.

The discretion which is exercised by a court in granting or withholding equitable relief is not an arbitrary or whimsical discretion, but is to be exercised in accordance with the evidence in the case and on definite principles and precedents. (21 Cor. Jur. 34; *Johnson* v. *Poteet* (Tex. Civ. App.), 279 S. W. 902.) The evidence in the Downs case, *supra,* called for the withholding of equitable relief, and therefore the evidence in this case, standing without conflict, entitled the plaintiff to the same treatment.

The evidence here being uncontradicted, the findings should have been favorable to this defense. The testimony shows that, during the lapse of time since 1903, conditions have so changed, in the tract itself, on the opposite sides of the streets bounding the tract and touching each block thereof on either two or three sides, and also in the neighborhood surrounding the tract, as to require the court to withhold equitable relief as unjust and burdensome out of proportion to any benefit that could be derived by the plaintiffs from the judgment. The restrictions are not limited in time but are perpetual and the property owners in this tract may be required to see their buildings decay with no definite knowledge of when the legal status of the neighborhood may change and therefore not knowing what character of improvements or repairs may profitably be made. They must either have relief in this action or some similar action

at an uncertain time in the future or must remain subject to the whim of the last property owner in the tract who shall concede that conditions have sufficiently changed to warrant an abandonment of the restrictions.

The conclusion we have arrived at upon this point requires a reversal of the judgment as to each of the appellants and it is therefore unnecessary for us to decide the other points made and segregate and divide them as they might be found to be available and applicable to the several defendants as they might be grouped according to the diverse circumstances and facts affecting them.

The judgment is reversed.

Sturtevant, J., and Nourse, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 31, 1928.

All the Justices concurred.