[L. A. No. 18735.   In Bank.   Aug. 31, 1944.]

HAZEL FAIRCHILD et al., Respondents, v. ROSS H. RAINES et al., Appellants.

Lester V. Peterman for Appellants.

Willis O. Tyler, Loren Miller, George E. Cryer and R. Alston Jones as Amici Curiae on behalf of Appellants.

McEachern & Ritchie for Respondents.

Hahn & Hahn and Lindstrom & Bartlett as Amici Curiae on behalf of Respondents.

SCHAUER, J.—Defendants have appealed from a judgment rendered by the court sitting without a jury, by which defendants Ross H. Raines and Helen Louise Raines (who are colored Americans) are "enjoined and restrained from using, occupying or residing prior to the 1st day of January, 1950, upon . . . Lot No. 43 of the Palisades Tract in the [City of Pasadena,] County of Los Angeles, State of California," and by which defendants Frank F. Winsell and Mary Winsell, his wife (who are Caucasians), are "enjoined and restrained from permitting said defendants . . . [Raines], or any other person not of the Caucasian race, to use, occupy or live upon said real property prior to the first day of January, 1950."

The Palisades Tract is a subdivision in the city of Pasadena embracing a total of sixty-nine lots, of which thirty-one

front on Palisade Street (which runs east and west) in the block between Arroyo Boulevard on the west and Forest Avenue on the east, and the remaining thirty-eight lots front on the tract boundary streets (Arroyo Boulevard on the west, Forest Avenue on the east, and Washington Street on the south) and are all contiguous to and, either at the side or the rear, abut upon and adjoin some one of the lots fronting on Palisade Street. At the time of the original subdivision apparently no racial restrictions were placed on any of the property in the tract but in 1927 owners representing thirty-five (possibly only thirty-three) of the sixty-nine lots in the tract entered into a contract whereby each signing owner, as a covenant running with the land, agreed to restrict the use and occupancy of the property owned by him, up to the first day of January, 1950, to persons of the Caucasian race. It is apparent from the terms of such contract that the signers intended its restrictive covenants to become effective as to the several parcels owned by them, respectively, regardless of whether the owners of all or any particular number or proportion of the lots in the tract joined in it and, hence, the cases of *Foster* v. *Stewart* (1933), 134 Cal.App. 482 [25 P.2d 497], and *Oberwise* v. *Poulos* (1932), 124 Cal. App. 247 [12 P.2d 156] (in which cases it appears that the contracts by their terms were not intended to become effective until and unless signed by a certain number of property owners in the affected tracts), are not controlling. Nevertheless, the number and relative locations of the lots covered and not covered by the agreement are material, as hereinafter appears.

Twenty-eight (possibly twenty-six) of the thirty-one lots fronting on Palisade Street, seven of the twelve fronting on Arroyo Boulevard, none of the twelve fronting on Forest Avenue, and none of the fourteen fronting on Washington Street are covered by the contract. In other words, at least thirty-four lots in the tract are not restricted as to racial occupation or use. These thirty-four lots comprise three (possibly five) fronting on Palisade Street, five fronting on Arroyo Boulevard, twelve (all) fronting on Forest Avenue, and fourteen (all) fronting on Washington Street. As previously mentioned all of the lots fronting on Arroyo Boulevard, Forest Avenue, and Washington Street are contiguous at some point to a lot fronting on Palisade Street. The lot in

controversy (lot 43) fronts on Palisade Street and adjoins, on the east, lot 42, which is restricted, and, on the west, the rear of lots 44 and 45 (fronting on Arroyo Boulevard), which are not restricted, and the rear of lots 46 and 47, which are restricted. At its rear it abuts upon lot 48, which is restricted, and at its southeast corner touches lot 52 (fronting on Washington Street), which is not restricted. Directly across Palisade Street from lot 43 is lot 6, which is restricted; so also is lot 5, which adjoins lot 6 to the west, but adjoining a portion (50 feet) of the side of lot 5 is lot 4 (fronting on Arroyo Boulevard at the corner of Palisade Street), which is not restricted. Lots 1, 2, and 3, also fronting on Arroyo Boulevard, likewise adjoin the east side of lot 5, and of these lot 3 is restricted but lots 1 and 2 are not restricted.

Plaintiffs are the owners of certain of the restricted lots in the tract. The complaint alleged and the court found the facts as to such ownership, as to the execution and recordation of the restriction agreement, and that as to lot 43 (the lot here involved) the agreement was executed by the then owners, from whom, by mesne conveyances, defendants Winsell acquired title prior to the commencement (on June 23, 1942) of this action; that "shortly prior to the commencement of this action, defendants . . . Winsel . . . , being the owners of lot 43 of said Palisades Tract, entered into an agreement with defendants . . . Raines, wherein and whereby said . . . [defendants] Winsell agreed . . . to sell and convey, and said defendants . . . Raines agreed . . . to purchase, said lot No. 43 . . . ; that by the terms and conditions of said agreement . . . [defendants] Winsell retain the legal title to said lot 43 until the full purchase price is paid; that by the terms and conditions of said agreement . . . [defendants] Raines were permitted to enter into possession of, and to use and occupy and live upon said lot No. 43; that said . . . [defendants] Raines did, prior to the commencement of this action, enter into possession of, and ever since have used and occupied and still do use, occupy and live upon said lot No. 43"; and that defendants Raines are of the negro race and their occupation of lot 43 is "contrary to and in violation of" the race restriction agreement

and plaintiffs have thereby "been injured and damaged."

As a special defense (third affirmative) defendants allege "That at the time of making said agreement [in the year 1927] . . . there were no non-Cauccasians using or occupying property within several blocks of said Palisades Tract . . . That since the execution of said agreement and particularly within the last five years, non-Caucasian occupancy of the premises *and in the same tract and block* [italics added] has expanded with increasing frequency so that at the present time a large porportion of the lots in the immediate vicinity and adjoining lots named in said agreement are now occupied by persons not of the Caucasian race but of the negro race and as a consequence thereof, said property is not now as desirable for occupancy by persons of the white or Caucasian race . . . ; that at the present time lots 18, 20, 29, 30, 31, 32, 33 and 34 [which front on Palisade Street] are adjoined by lots occupied by persons of the negro race; that defendants are informed and believe that other lots described in . . . [the agreement] are adjoined by lots now occupied by persons who are non-Caucasians. . . . That as a result of said change in conditions, the enforcement of said agreement . . . would not benefit the plaintiffs but would irreparably injure the defendants and the plaintiffs in that the lots in said Palisades Tract described in . . . [the agreement] would not be occupied by persons of the white race and could not be occupied by persons who were non-Caucasians."

In this connection defendants contend that the undisputed evidence introduced in support of the third affirmative defense demonstrates such change in the character of the surrounding neighborhood (including non-restricted lots in the same tract) since the making of the race restriction agreement in 1927 as to bring this case as a matter of law within the oft-applied principle that "equity courts will not enforce restrictive covenants by injunction in a case where, by reason of a change in the character of the surrounding neighborhood, not resulting from a breach of the covenants, it would be oppressive and inequitable to give the restriction effect, as where the enforcement of the covenant would have no other result than to harass or injure the defendant, without benefiting the plaintiff" (*Hurd* v. *Albert* (1931), 214 Cal. 15, 23 [3 P.2d 545]; see *Downs* v.

*Kroeger* (1927), 200 Cal. 743, 747 [254 P. 1101]; *Friesen* v. *City of Glendale* (1930), 209 Cal. 524, 529 [268 P. 1080]; *Hess* v. *Country Club Park* (1931), 213 Cal. 613, 620 [2 P.2d 782]; *Marra* v. *Aetna Construction Co.* (1940), 15 Cal.2d 375, 378 [101 P.2d 490]), and that therefore the court erred in granting plaintiffs injunctive relief. Particularly it is urged that the court erred in failing to make findings of fact resolving the issues raised by such affirmative defense. If such issues are material—and we conclude that they are— and if there was competent evidence tending to establish the affirmative of such issues, it was error not to determine them by appropriate findings.

It appears from the bill of exceptions that plaintiff Hazel Fairchild, one of the signers of the race restriction agreement, testified that at the time such agreement was made "no colored family lived within several blocks of the restricted area but at the present time there are negro families living on Del Monte street [immediately] north of Palisades [the street on which most of the lots included in the agreement front], on Forrest avenue [immediately] east, and Washington street [immediately] south of the restricted area; there are no colored persons living within the area covered by the . . . agreement except the Raines family [defendants] on lot 43; for the last several years a colored family has been living on lot 19 [which is within the tract and fronts on Palisade Street but is not included in the agreement], which adjoins lot 18 [included in the agreement] on the east."

One H. P. Hammond, a real estate broker, testified on behalf of plaintiffs that he had maintained his office in Pasadena for "many years"; that "It has been my experience that invariably when a negro family moves into a neighborhood theretofore occupied by white people, the value of the surrounding property drops fifty per cent. The fact that negro families have moved in and are living on Washington street on lots directly south of Palisades street would cause the same decrease in realty values." The lots referred to on Washington Street are within the Palisades Tract. Mr. Hammond was the only witness on the subject of damages by reason of negro occupancy of premises in the neighborhood and it is to be noted that his testimony supports the conclusion that

the Palisades Tract is not damaged by the occupancy of lot 43 by Mr. and Mrs. Raines; that the damage occasioned that neighborhood by negro occupancy had already been sustained by reason of the influx of negroes on Washington Street in the same tract.

Defendant Ross H. Raines testified that he and his ''family are living in the house on lot 43 . . . ; that Del Monte is the name of the street directly north of Palisades street, and Forrest avenue is directly east, and negro and Mexican families live along those streets and on lots adjoining the lots restricted; that a negro family lives across the street from me down at the end of the block on lot 19; that there is no alley between the lots on Palisades street and Washington street and several families of negroes live along Washington street on lots that adjoin on the south, lots described in the race restriction agreement; that the neighborhood, except the lots described in the race restriction agreement, is occupied predominantly by negro families.''

Edna Griffin, a physician and surgeon, testified on defendants' behalf that ''I maintain my office in Pasadena; I am familiar with the northwest part of Pasadena and particularly that part wherein is located Palisades, Del Monte, Forrest and Washington streets; I have patients living on all those streets upon whom I make professional calls and those patients are negroes; I know of at least twelve families of negroes living on Washington street immediately south of Palisades street and west of Forrest; that part of Pasadena is occupied predominantly by negroes and is more suitable for negroes than for white people.''

One Sadie Wright, called as a witness by defendants, testified that ''I have lived in Pasadena over forty years and have been familiar with the area wherein is located Palisades, Del Monte, Forrest and Washington streets since it was an orange grove; that over twenty years ago only white people lived in that area but at the present time, with the exception of the lots covered by the race restriction agreement, it is occupied principally by negroes and is more suitable for the occupancy of negroes than of white people.''

It is thus established by the testimony of one of plaintiffs themselves—the witness Hazel Fairchild—that since the making of the agreement the several restricted parcels have

become substantially surrounded, in the same tract and block, on three sides by negro residents, and by the testimony of plaintiffs' witness Hammond that the presence of negro residents on Washington Street (in the same tract) effected a decrease in value of plaintiffs' property within the tract independently of the presence of defendants Raines on lot 43. The testimony of defendants' witnesses further tends to establish that the neighborhood, including the very block in the Palisades Tract in which the restricted property is located, is now predominantly negro, "more suitable for negroes than for white people," and that several of the lots included in the agreement are adjoined by lots on which negroes reside. Likewise material is the fact that by the terms of the agreement its restrictive covenants will expire in a little more than five years from this date.

On behalf of plaintiffs it is contended that the third affirmative defense and the above epitomized evidence supporting it are entirely immaterial; that under the circumstances related the plaintiffs' right to injunctive relief is absolute and that there is no field for the exercise of judicial discretion as to the granting or withholding of such relief. We are unable to sustain plaintiffs in this contention.

It appears to us that sound judicial philosophy demands that a measure of discretion be permitted the trial court in the premises. If we were to uphold the view of the plaintiffs that covenants such as those here involved must in any circumstances be enforced absolutely without regard to the number or proportion of lots in a tract subjected to the restrictions, without consideration of the occupancy and use of the adjoining property or of the length of time during which the imposed restrictions are to endure, we would ignore principles of equity which are fundamental. If the above related circumstances are legally immaterial under the facts of this case, then they would be immaterial if they showed that only two lots of a tract were restricted although all others were free and were occupied by colored Americans and even though only five months or five weeks instead of five years remained in the life of the restrictions. We are of the view that, subject to certain broad principles, each case of this character must be determined upon the facts peculiar to it.

█ It is the general rule that the granting or withholding of equitable relief involves the exercise of judicial discretion. (*Vesper* v. *Forest Lawn Cemetery Assn.* (1937), 20 Cal.App.2d 157, 163 [67 P.2d 368] ; *Diederichsen* v. *Sutch* (1941), 47 Cal.App.2d 646, 649 [118 P.2d 863].) It is likewise true, as a general rule, that "the equity courts will not enforce restrictive covenants by injunction in a case where, by reason of a change in the character of the surrounding neighborhood, not resulting from a breach of the covenants, it would be oppressive and inequitable to give the restriction effect, as where the enforcement of the covenant would have no other result than to harass or injure the defendant, without benefiting the plaintiff." (*Hurd* v. *Albert* (1931), *supra*, 214 Cal. 15, 23.) As was said in *Trustees of Columbia College* v. *Thacher* (1882), 87 N.Y. 311, 317 [41 Am.Rep. 365, 367], "It certainly is not the doctrine of courts of equity, to enforce, by its peculiar mandate, every contract, in all cases, even where specific execution is found to be its legal intention and effect. It gives or withholds such decree according to its discretion, in view of the circumstances of the case . . . And so, though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous, that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff." (Quoted and followed in *Downs* v. *Kroeger* (1927), *supra*, 200 Cal. 743, 747; *cf. Walker* v. *Haslett* (1919), 44 Cal.App. 394, 398, 401 [186 P. 622], wherein, although an injunction was directed, it was made without prejudice to future modification "because possible future changes in the condition of the neighborhood may entitle defendant to a modification or even a dissolution.") Also, as to the duration of restrictions and their enforcibility it has been said that "the sound course is to hold that where the purpose of the restriction can no longer be carried out the servitude comes to an end; that the duration of the servitude is determined by its purpose." (Ames, Lectures on Legal History (1913), 381.)

█ Plaintiffs emphasize that there had been no change in "Negro or non-Caucasian occupancy" of the lots *included in the agreement* until the occupancy by defendants Raines of lot 43. This is a material fact admitted by defendants but it is not necessarily controlling here. In an area as

small as that involved in this case (some thirty-five of the sixty-nine lots in the entire tract) *and where the restricted lots do not form a single contiguous group,* it would not seem essential that the occupancy of any of such restricted lots themselves should have undergone the critical change if it has occurred in the very neighborhood of which they are a contiguous part geographically and, apparently, in social aspects. Indeed, it is obvious that a change in the race character of the neighborhood, without violation of the covenants of the agreement, could occur only through a change in the occupancy of neighboring lots *not* included in the agreement. (See *Downs* v. *Kroeger* (1927), *supra,* 200 Cal. 743; *cf. Jewett* v. *Albin* (1928), 90 Cal.App. 535, 543, 546 [266 P. 329].)

The contention of plaintiffs that the proposition of law declared in the case of *Downs* v. *Kroeger, supra* (a restriction against other than residential use), has no application to a race restriction case cannot be sustained. (See *Letteau* v. *Ellis* (1932), 122 Cal.App. 584, 588 [10 P.2d 496].) It is, of course, true that race restriction agreements as to the use and occupancy of real property are normally recognized as valid (*Los Angeles Investment Co.* v. *Gary* (1919), 181 Cal. 680, 683-684 [186 P. 596, 9 A.L.R. 115]) and enforcible by injunction (*Wayt* v. *Patee* (1928), 205 Cal. 46, 49-50 [269 P. 660]). It is also true that where all, or perhaps substantially all, of the contiguous lots of a tract of substantial extent are subject to race restrictions the courts should not fail to enforce the covenants as to the restricted area merely because surrounding property eventually is put to the use and occupation prohibited to the restricted area. (See *Porter* v. *Johnson* (1938), 232 Mo.App. 1150, 1158 [115 S.W.2d 529].) Obviously the precise purpose of the covenants is to avert changes in the restricted territory, not in the surrounding neighborhood, and they can have no legal efficacy beyond the area of the tract to which they are applicable. The mere fact that a change in the character of the use of neighboring property may make free use of restricted property more profitable does not warrant failure to enforce the restriction "if the original purpose of the covenant can still be realized." (*Marra* v. *Aetna Construction Co.* (1940), *supra,* 15 Cal.2d 375, 378, a building restriction case.)

Here the third affirmative defense places before the trial court the question as to whether the original purpose of the restrictive covenant can still be realized by the owners of the lots which front upon Palisade Street. The fact that all the lots in the tract are not subject to the covenant is not conclusive of the issue. Even if restrictions are not enforcible as to every lot in an area originally covered by an agreement they may be upheld as to a part of that area if such part is of sufficient extent and so located that the original purpose of the restrictions can be accomplished. (*Downs* v. *Kroeger* (1927), *supra*, 200 Cal. 743, 749.)

On behalf of plaintiffs emphasis has been placed on the case of *Grady* v. *Garland* (1937), (U.S.C.A.,D.C.), 89 F.2d 817 [67 App.D.C. 73]. That case, however, not only fails to sustain the proposition that the right of plaintiffs to an injunction is absolute but rather tends to lend support to our view that an exercise of judicial discretion is involved. Plaintiffs there sought to quiet their title to six of a group of eight adjoining lots as against a covenant as to each of the eight lots that "said lot shall never be rented, leased, sold, transferred or conveyed unto any negro or colored person under a penalty of two thousand dollars." Upon the pleading itself the complaint was dismissed. The court said (at p. 818): "While it is true that the averments of the bill are admitted by the motion to dismiss, we think the bill wholly fails to allege facts sufficient to justify the granting of the relief sought. The bill merely alleges, in effect, that by reason of the occupancy by colored persons of the territory immediately west of the property in question, plaintiffs' property has been damaged and that it could not result in damage to the defendants to have the restriction removed. These are merely conclusions, not supported by any facts alleged in the bill, since there are no averments to the effect that the property has been rendered less valuable for rental purposes or for sale, or that the character of the environment would make it unfit or unprofitable for use by the enforcement of the restriction, or that a material change has occurred in the environment since plaintiffs acquired title to their respective properties—all of which are facts important to be considered in an action for the removal of the restriction." The facts recited in the quoted statement distinguish that case from the one at bar. The facts enumerated as "important to

be considered in an action for the removal of the restriction,'' which facts were not averred in the complaint there, are, in substance, the very facts which are alleged in the third affirmative defense here and which plaintiffs assert are immaterial.

In the Grady case, *supra,* the court further said (at p. 819): ''It might be that under such circumstances [where the matters complained of were foreign to the grounds on which the restriction was based] surrounding conditions would be sufficient to justify the removal of the restriction, but the restriction here is against the disposal of the property in question to colored people, and the complaint now is that colored people are living in the *adjoining neighborhood* [italics added], to the damage of these complainants. The restriction is for the protection of the property to which it applies, and is not affected by similar conditions which may arise in adjoining property. *Castleman* v. *Avignone,* 56 App.D.C. 253, 12 F.2d 326. The object of the restriction here was to prevent the invasion of the restricted property by colored people, not the invasion of property surrounding it.

''If the facts here alleged were sufficient in equity to justify the setting aside of the covenant of restriction, all that would be necessary to defeat such a covenant would be the settlement of a few colored families in the immediate vicinity of the restricted areas. . . .

''A mere glance at the present situation demonstrates the protection which the restriction is to the defendants . . . It furnishes a complete barrier against the eastward movement of colored population into the restricted area—a dividing line.''

But in the case before us there is no ''complete barrier.'' Upon the evidence introduced it appears that not only the ''surrounding neighborhood'' but the very tract and block of which the restricted lots are a part has been invaded. As previously set out the witness Sadie Wright testified—and she was not disputed—in reference to the entire Palisades Tract ''that over twenty years ago only white people lived in that area but at the present time, with the exception of the lots covered by the race restriction agreement, it is occupied principally by negroes and is more suitable for the occupancy of negroes than of white people.'' Since the lots covered by the agreement are not a contiguous group

and do not constitute a complete barrier or dividing line as to any whole tract or block or other well-defined area or neighborhood, and since lot 43 (the mooted lot) is adjoined on one side by two unrestricted lots and is otherwise situated as hereinbefore described, it is our conclusion that the record cannot be held to establish an absolute right in plaintiffs to the injunction against the use and occupancy of the mentioned lot by defendants Raines. The failure of the trial court to specifically find on the issues raised by the third affirmative defense therefore becomes material.

The only finding of the trial court directed to the issues raised by such special defense is that "As to the allegations of . . . [such defense], the court finds that since 1927 negro and Mexican occupancy of properties has increased near or in the vicinity of the lots described in said race restriction agreement, but that there has been no change in negro occupancy as to any of the lots described in said race restriction agreement, except the occupancy complained of in this action." Such finding, in the light of the more specific allegations of the defense, and of the evidence tending to support those allegations, is not adequate and, hence, does not establish that plaintiffs are entitled to the injunctive relief granted.

Where a trial court makes findings upon all essential ultimate facts it is not error to fail to find upon evidential matters (see *Williams* v. *McDowell* (1939), 32 Cal.App. 2d 49, 52 [89 P.2d 155]; *Ryan* v. *San Diego Elec. Ry. Co.* (1942), 52 Cal.App.2d 460, 464 [126 P.2d 401]) but this rule is not applicable in an equity suit where probative facts, which are material to the exercise of sound judicial discretion in the premises, and which may be sufficient to constitute a defense against the relief sought, are pleaded and are supported by competent evidence. Since, under such circumstances, the probative facts as pleaded in themselves constitute material issues, the rule stated in *James* v. *Haley* (1931), 212 Cal. 142, 147 [297 P. 920], is controlling: "Ever since the adoption of the codes, it has been the rule that findings are required on all material issues raised by the pleadings and evidence, unless they are waived, and if the court renders judgment without making findings on all material issues, the case must be reversed." (See also *Krum* v. *Malloy* (1943), 22 Cal.2d 132, 136 [137 P.2d 18].)

For the reasons hereinabove stated the judgment is reversed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., and Carter, J., concurred.

TRAYNOR, J.—I concur in the judgment. In my opinion the findings of the trial court fail not only to provide an adequate basis for determining whether enforcement of the restriction in the light of changed conditions would impose great hardship upon the defendants with little or no benefit to the plaintiffs (*Trustees of Columbia College* v. *Thacher,* 87 N.Y. 311, 317 [41 Am.Rep. 365, 367]), but to consider whether enforcement would be contrary to the public interest in the use of land in urban communities where people are concentrated in limited areas.

The public policy against restricting the free use of land finds expression in the rule that an instrument creating an equitable servitude must be strictly construed and any doubts resolved in favor of the free use of the land. (*Werner* v. *Graham,* 181 Cal. 174, 181 [183 P. 945]; *Marra* v. *Aetna Construction Co.,* 15 Cal.2d 375, 378 [101 P.2d 490].) Again, building restrictions imposed by private agreement between landowners cannot stand in the way of the public interest. Thus in *Friesen* v. *City of Glendale,* 209 Cal. 524 [268 P. 1080], covenantors entitled to the restrictive use of land were denied compensation for its use as a public street on the ground that the interest under a restrictive covenant ''is not a property right, but is a contractual right cognizable in equity as between the contracting parties, not binding on the sovereign contemplating a public use of the particular property taken.'' (209 Cal. 524, 531; see 19 Cal.L.Rev. 58). In *Sackett* v. *Los Angeles City School Dist.,* 118 Cal.App. 254 [5 P.2d 23], the court held that a school district was not bound by a covenant restricting the use of lots to residential purposes, but was free to use the land for school playground purposes. The court stated, ''the state and its various political subdivisions may not be bound by the terms of a private contract to which it was not a party (*United States* v. *Certain Lands,* 112 F. 622; *Doan* v. *Cleveland Short Line Ry Co.,* 92 Ohio St. 461 [112 N.E. 505]; *Friesen* v.

*City of Glendale, supra*). Public policy has been denominated a vague and uncertain guide at best (*Miller & Lux* v. *Madera Canal etc. Co.*, 155 Cal. 59 [22 L.R.A. N. S. 391, 99 P. 502]), but instances arise that call for its application. The present action is one that does. It presents the situation of an agency of the state created for the sole purpose of providing adequate educational facilities for the youth of a certain limited area against whom there is sought to be invoked the aid of equity to enforce a restriction created by the provisions of a private contract to which the state was in nowise a party and by which it neither expressly nor by necessary implication consented to be bound. The state may not be thus hampered in carrying out a purpose in which it is so vitally interested." (118 Cal.App. 254, 258.) In *Hurd* v. *Albert*, 214 Cal. 15 [3 P.2d 545], a tract restricted to residential purposes became enclosed in a business district as the city of Los Angeles developed. The public interest in the development of the city rendered the agreement unenforceable, even though its beneficiaries retained some interest in its enforcement. In *Letteau* v. *Ellis*, 122 Cal.App. 584, 588 [10 P.2d 496], the court held that a restriction against occupancy of land by persons of negro descent was unenforceable because of changed conditions, stating: "We find it needless to follow appellants' arguments on the technical rules and distinctions made between conditions, covenants and mere restrictions . . . A principle of broad public policy has intervened to the extent that modern progress is deemed to necessitate a sacrifice to many former claimed individual rights. The only obstacle met has been the rule of property or as termed the disinclination to disturb vested property rights. To some extent this, too, has yielded in the sense that many rights formerly labeled as property rights by a process of academic relation are now considered merely personal and have been subjected to the common good." (See also, *Batchelor* v. *Hinkle*, 210 N.Y. 243 [104 N.E. 629]; *Forstmann* v. *Joray Holding Co. Inc.*, 244 N.Y. 22 [154 N.E. 652]; 14 Columb.L.Rev. 438; 3 Tiffany, Real Property (1939) 522.)

In the present case there is a public interest in the congestion of the limited residential districts for colored people. That congestion is a consequence of residential segregation

of the colored population accomplished, not by ordinances, which would be unconstitutional (*Buchanan* v. *Warley,* 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149, 210 Ann.Cas.1918A 1201]; *Harmon* v. *Tyler,* 273 U.S. 688 [47 S.Ct. 471, 71 L.Ed. 831]; *City of Richmond* v. *Deans,* 37 F.2d 712, aff'd 281 U.S. 704 [50 S.Ct. 407, 74 L.Ed. 1128]; *City of Dallas* v. *Liberty Annex Corp.* (Tex.Civ.App.), 19 S.W.2d 845; see 16 C.J.S. 1474; Hunting, *The Constitutionality of Race Distinctions and the Baltimore Negro Segregation Ordinance,* 11 Columb.L.Rev. 23; Minor, *Constitutionality of Segregation Ordinances,* 18 Va.L.Rev. 561; Benson, *Segregation Ordinances,* 1 Va.L.Rev.(N.S.) 330; Mangum, The Legal Status of the Negro, p. 138 et seq.), but by agreements between private persons, which the courts have recognized as valid. (*Corrigan* v. *Buckley,* 271 U.S. 323 [46 S.Ct. 521, 70 L.Ed. 969]; *Los Angeles Inv. Co.* v. *Gary,* 181 Cal. 680 [186 P. 596, 9 A.L.R. 115]; *Janss Inv. Co.* v. *Walden,* 196 Cal. 753 [239 P. 34]; *Queensborough Land Co.* v. *Cazeaux,* 136 La. 724 [67 So. 641, Ann.Cas.1916D 1248, L.R.A.1916B 1201]; *Parmalee* v. *Morris,* 218 Mich. 625 [188 N.W. 330, 38 A.L.R. 1180]; *Porter* v. *Barrett,* 233 Mich. 373 [206 N.W. 532, 42 A.L.R. 1267]; *United Cooperative Realty Co.* v. *Hawkins,* 269 Ky. 563 [108 S.W.2d 507]; see Bruce, *Racial Zoning by Private Contract in the Light of the Constitution and the Rule Against Restraint on Alienation,* 21 Ill.L.Rev. 704; Martin, *Segregation of Negroes,* 32 Mich.L.Rev. 721; 23 Cal.L. Rev. 361; Mangum, *op. cit.* p. 147; *cf. Gandolfo* v. *Hartman,* 49 F. 181 [16 L.R.A. 277]; Rutledge, J., concurring in *Hundley* v. *Gorewitz,* 132 F.2d 23, 25.)

The problem of race segregation cannot be solved by the courts alone, for it involves emotions and convictions too deeply imbedded in the social outlook of men to be uprooted overnight by judicial pronouncements. Nevertheless the problem must be confronted step by step, however provisional the solution, with regard both for the interests of minority groups and the general public interest. It must be recognized that the steady migration of southern negroes and the influx of negroes into urban communities in response to the increasing demands of industry for labor, together with race segregation (see Kennedy, The Negro Peasant Turns Cityward, ch. II, The Causes of Migration, p. 41;

Woofter, Negro Problems in Cities, ch. II, The Rapid City
Growth, p. 26; Sterner, The Negro's Share, A Study of In-
come, Consumption, Housing, and Public Assistance, pp. 186-
209; Martin, *Segregation of Negroes,* 32 Mich.L.Rev. 721),
have made it impossible for many negroes to find decent
housing in large centers of population. The report of the
Committee on Negro Housing of the President's Conference
on Home Building and Home Ownership (1932) page 3,
states: "Cities of the North . . . have shown increases
ranging from 10 to 600 per cent. Chicago's Negro popula-
tion in 1910 was 44,103; in 1930 it had increased to 233,903.
Philadelphia's increased from 84,459 in 1910 to 219,599 in
1930, and that of New York . . . from 91,709 to 327,706."
In recent years there has been a large negro migration into
Southern California. The census of 1940 shows an increase
of the colored population of Los Angeles from 67,348 in 1930
to 97,847 (Statistical Abstract of the United States, 1942,
78th Congress, 1st Sess., House Document No. 53, p. 29),
and the war has accelerated the pace of this migration.

Negroes migrating into urban communities have found
barriers at every turn. "Segregation . . . has kept the
Negro-occupied sections of cities throughout the country fa-
tally unwholesome places, a menace to the health, morals and
general decency of cities, and 'plague spots for race exploita-
tion, friction and riots.' " (Report of the Committee on
Negro Housing of the President's Conference on Home Build-
ing and Home Ownership, pp. 45 and 46.) The choice lies
between the continuation of such conditions and the expan-
sion of urban negro districts. Race restriction agreements,
undertaking to do what the state cannot, must yield to the
public interest in the sound development of the whole com-
munity. The courts, as the agencies of the state confronted
with the problem of enforcing racial zoning by private agree-
ments, must consider all of the factors that affect the public
interest. It is pertinent to recall the words of Judge Cardozo
in his concurring opinion in *Adler* v. *Deegan,* 251 N.Y. 467,
484 [167 N.E. 705, 711]: "The Multiple Dwelling Act is
aimed at many evils, but most of all it is a measure to erad-
icate the slum. It seeks to bring about conditions whereby
healthy children shall be born, and healthy men and women
reared, in the dwellings of the great metropolis. To have
such men and women is not a city concern merely. It is the

concern of the whole state. Here is to be bred the citizenry with which the State must do its work in the years that are to come. The end to be achieved is more than the avoidance of pestilence or contagion. The end to be achieved is the quality of men and women . . . If the moral and physical fibre of its manhood and womanhood is not a State concern, the question is, what is?''

In the present case a residential district populated by colored people now surrounds the restricted area on three sides. The question whether the restricted area shall stand as a barrier against expansion of the negro district cannot be determined entirely by findings with regard to property values and the interests of property owners. It is also necessary to determine whether maintenance of this barrier would deprive the colored population of any feasible access to additional housing and compress it within the inflexible boundaries of its present district at the risk of a congestion whose evils would inevitably burst the bounds of that district.

The trial court should therefore be directed to make findings as to the housing facilities available in the district occupied by the colored population and to determine whether there is a need for additional housing that would justify an expansion of the district by absorption of the restricted area.