Filed 10/2/25  Holmby Westwood Property Owners Assn. v. Focus Line CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| HOLMBY WESTWOOD PROPERTY OWNERS ASSOCIATION, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FOCUS LINE, LLC, <br><br> Defendant and Appellant. | B331094 <br><br> Los Angeles County Super. Ct. No. 20SMCV01575 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edward B. Moreton, Jr., Judge. Affirmed.

Goodkin Law Group, Daniel L. Goodkin and Randy Aguirre for Defendant and Appellant.

Luna & Glushon, Robert L. Glushon and Sean M. Bryn for Plaintiff and Respondent.

_____

Plaintiff Holmby Westwood Property Owners Association (POA) is a property owners association for the Holmby Westwood neighborhood in Los Angeles. Defendant Focus Line, LLC (Focus) owns property in the neighborhood. Its managing member is Farhad Larian, an experienced residential developer. Focus purchased the property (the Property) with an old, dilapidated house on it, demolished the house, and built a new, much larger, house in its place. Focus did so despite warnings from the POA that the new house violated restrictions on the Property. The POA sued Focus to enjoin Focus's construction. After a bench trial, and when the construction was largely complete, the trial court determined the new house violated valid restrictions on the Property and ordered the house "removed or modified" to comply with such restrictions.

For the reasons set forth herein, we affirm the judgment.

## BACKGROUND

### I. The Neighborhood, the Restrictions, and the POA

The POA is composed of persons owning properties in Los Angeles's Holmby Westwood neighborhood (Holmby-Westwood). There are approximately 1,100 such properties, the product of the subdivision of several larger tracts. The Janss Investment Corporation and Holmby Corporation (Janss/Holmby) were involved in the development of these tracts, including one identified as tract 9200. Tract 9200 contains between 80 and 85 lots originally developed as single-family residences. The Property is one such lot. It is located at the corner of Holmby Avenue and Lindbrook Drive, just north of Wilshire Boulevard.

The Property was first transferred as a standalone lot in 1935 by grant deed (Moss Deed) from Janss/Holmby, as grantors, to Jack Moss, as grantee. The deed describes the Property as

"Lot [19] Block [1] of Tract [9200] according to a map of said tract filed for record in . . . the [Los Angeles County Registrar-Recorder]." The deed contains no reference to any other tracts or the greater Holmby-Westwood neighborhood.

The Moss Deed contains several restrictions on the use of the Property, including that: (1) it could "be used for private residence purposes only"; (2) any residence built thereon had to (a) front Lindbrook Drive, (b) sit no closer than 35 feet to Lindbrook, and (c) sit no closer than 4 feet from the Property's side lines; and (3) fences or walls could not be built, nor hedges grown, (a) along Lindbrook, (b) higher than 3 feet if within 35 feet of Lindbrook, nor (c) higher than 5 feet anywhere. These restrictions were to continue in effect until January 1, 1976.

The Moss Deed expressly allowed for exceptions to be made to some of the restrictions. For example, a garage, a tennis court fence, or retaining wall could be erected at variance with the restrictions if first "approved in writing by the grantors." The deed contains no reference to any other entity having authority to permit variances—not a property owners association, not other owners of properties within tract 9200 or Holmby-Westwood, not even successors or assigns of Janss/Holmby.

The Moss Deed prescribed only one consequence for breach of the restrictions: It would "cause title to [the Property] to revert to [Janss/Holmby], or their successors or assigns . . . ." The deed did not provide for enforcement by a property owners association nor by other owners of properties within tract 9200 or in any other part of Holmby-Westwood.

Even though the grantors did not commit to subjecting all of the tract 9200 properties or Holmby-Westwood properties to restrictions, they apparently included restrictions of a similar

character in the deeds to all or substantially all of the properties, with all scheduled to expire in the 1970's.

Before the deed restrictions expired, the POA formed. Its initial purpose was to oppose proposed freeway construction in the area. However, as the stated sunset date of the restrictions approached, the POA undertook to both extend them and assume the right to enforce them.

To that end, POA board members went door-to-door to solicit Holmby-Westwood property owners' consents "to extend and modify the restrictions" and "to reaffirm the [POA]'s right to enforce [them]." Despite the language of reaffirmation, the parties to the present action stipulated that the POA theretofore had "not enforce[d] any alleged restrictions for any of the lots in Tract 9200."

The POA's solicitation was only partially successful. According to the POA's president, Sandra Brown, "about half" of an estimated 1,100 homeowners "agreed to stay with the [restrictions]." By Larian's count, owners of only about 460 of the 1,150 homes in Holmby-Westwood agreed to do so. The result is a patchwork of restricted and unrestricted properties, with three Holmby-Westwood tracts left entirely unrestricted.

The owners of the Property in 1975, Leon and Sally Naiditch, along with 48 other owners of homes in tract 9200, were among those to agree to the POA's proposal. Each signed an Agreement Extending and Modifying Deed Restrictions, which was recorded on August 15, 1975 (1975 Extension). More than 30 other tract 9200 owners did not sign the extension.

The 1975 Extension recites a "factual and legal background," which includes the statement that "[restrictions] have been imposed by deeds executed by [Janss/Holmby]

4

affecting each of the lots in [tract 9200] . . . ." The parties then agree that "[a]ll restrictions . . . which presently affect the lots or affected the lots on December 31, 1974, in [tract 9200] owned by the persons who sign this [extension], shall be continued in full force and effect until January 1, 1995," and thereafter automatically renewed for 20-year periods unless terminated pursuant to specified procedures. The 1975 Extension has not been terminated.

The 1975 Extension went on to establish an Architectural Supervising Committee (ASC) with oversight over proposed construction or renovation on subscribing lots. The ASC is to "function under and pursuant to such reasonable rules" promulgated by the POA "subject to [seven enumerated] general provisions." We summarize the relevant provisions: Proposals are subject to a two-stage approval process, with a "preliminary" assessment based on a less-detailed set of plans than the "final" assessment. At each stage, the ASC must consider a proposed plan's "(a) conformity to the deed restrictions . . . ; (b) effect upon the environment; and (c) harmony of external design with the surrounding community." Conformity to deed restrictions is not compulsory, however. The ASC has discretion to grant variances to the applicant if it finds a "compelling reason[]" to do so. Further, whether the ASC approves or disapproves of a plan, it must give its decision "in writing, signed by at least four [of its] members." Failing such a response within 45 days of a proper plan submission, the submission is deemed approved. If it is rejected, the applicant has the right to appeal to the POA.

Finally, the 1975 Extension contained an enforcement provision completely different than that contained in the Moss Deed: "In the event of any violation or threatened violation of the

5

restrictions by any owner, lessee, or occupant of any lot in [tract 9200], any or all of the then owners of the lots in the Tract owned by persons who signed this [extension] shall have the right to enjoin such violation or threatened violation in a court of competent jurisdiction." The 1975 Extension "bind[s] and inure[s] to the benefit of each person signing it, his . . . successors, and assigns, and all of the real property in the Holmby-Westwood area owned by each person signing it. [¶] Both the benefit and the burden of this [extension] shall 'run with the land' owned by each person signing this [extension]."

The 49 property owners in tract 9200 signing the 1975 Extension were the minimum required to make it effective by its terms. There is no dispute that the more than 30 lots in the tract whose owners did not sign it are not subject to any restrictions.

Nearly 30 years after the 1975 Extension, the ASC issued Architectural Construction and Improvement Guidelines effective as of August 1, 2002 (2002 Guidelines). The document is not signed by any property owner. Nor is it recorded. It purports to apply to all properties in Holmby-Westwood. Nevertheless, the POA conceded at trial that the 2002 Guidelines do not apply to lots that did not sign on to the 1975 Extension. The only evident authority for the guidelines is that the 1975 Extension gives the POA the right to promulgate "reasonable rules" for the ASC's "function."

The 2002 Guidelines contain numerous provisions and restrictions not contained in the Moss Deed or the 1975 Extension, including many on topics not related to any addressed by those documents. Some relate to restrictions in the Moss Deed but expand upon or differ from them. For example,

the 2002 Guidelines purport to cap the size of structures that may be built upon lots in Holmby-Westwood. They also limit the permissible "architectural style" to four different types.

Further, the 2002 Guidelines modify the approval procedures contained in the 1975 Extension. Among other things, no longer may plans that vary from the restrictions be deemed approved by the ASC's failure to issue a written decision within 45 days. Under the 2002 Guidelines, a variance can "never, under any circumstances," be " 'deemed' approv[ed]."

## II. Focus Buys the Property; the POA Asserts the Restrictions in Opposition to Construction

Focus bought the Property in January 2020. The seller was not the Naiditches, who signed the 1975 Extension, but a successor. In form disclosures the seller made to Larian, it certified the Property was not subject to any restrictions or a homeowners association. However, the preliminary title report Larian received prior to closing *did* refer to the restrictions in the Moss Deed and the 1975 Extension. Larian testified he was unaware of the contents of the title report, but the trial court found that testimony not credible. Indeed, the evidence showed Larian received the preliminary title report, noted the existence of "covenants," and asked his agent to "download and review [them] and alert me to anything unusual or important that I should review."

Despite the information in the title report, Focus sought and obtained building permits from the City of Los Angeles to build a house that did not conform to the Moss Deed's restrictions. Most notably, notwithstanding the 35-foot setback prescribed by the deed, one corner of the house was to be sited within seven feet of Lindbrook Drive. Focus began demolition of

7

the existing structure in May 2020. By July 2020, the forms for the nonconforming foundation were in the ground. Around this time, Brown contacted Larian by letter. In addition to being president of the POA, Brown is also a member of the ASC. Despite her heavy involvement in POA governance and administration, Brown does not live in Holmby-Westwood.

In her initial letter, Brown asserted the Property was governed by restrictions "as renewed and signed by a previous owner." She then asserted Focus was required to submit plans for the house to the ASC in the form required by the 2002 Guidelines. She "suggest[ed] that review and approval be accomplished prior to construction in order to save [Focus] time and possibly, cost." Larian acknowledged receipt of the letter by e-mail a week later. About a week after that, Brown sent Larian another e-mail reiterating the ASC approval requirement and advised that, without such approval, Focus was building at its own risk. She also identified Ellen Turner, another POA board member and ASC member, as Larian's point person after plans were submitted.

On August 3, 2020, Larian sent Brown excerpts of the plans approved by the City. Turner addressed these in an August 14 e-mail. She noted a "discrepancy" between the 35-foot setback from Lindbrook Drive specified in the Moss Deed and the seven-foot setback at one corner of the house as shown in Focus's plans. She proposed Larian "think about [this]" in advance of a Zoom meeting with the ASC. Otherwise, she said the ASC was "generally pleased with the design of the house and only ha[d] minor concerns about finishes."

But after two lengthy Zoom meetings over the ensuing two weeks, Focus showed no interest in revising its plans to

accommodate the ASC's concerns regarding the setback. Nonetheless, Turner e-mailed Larian on August 26, 2020, with an offer: Focus could proceed with its plans if it received approvals from a "simple majority" of owners of single-family homes subject to the 1975 Extension within a 500-foot radius of the Property (the 500-foot poll). She invited Focus to solicit such approvals by "letter, subject to [the ASC's] approval." She noted the letter should state the ASC has not approved the setbacks as planned.

Larian immediately prepared a letter and solicited approvals. But he did not first show it to the ASC for its sign-off. When Larian forwarded acceptances from more than the requisite simple majority of applicable neighbors, Turner rejected them. She explained his solicitation letter failed to adequately describe the setback issue and invited him to resolicit, but only after getting ASC's sign-off on the form of letter.

Larian refused to resolicit. He contended that, in approaching the neighbors, he had fully disclosed information not contained in the approval letters and the neighbors "clearly underst[oo]d the situation." He told Turner: "We are not going to further inconvenience the neighbors who have signed the letter."

Despite Turner telling Larian the ASC would not consider the approvals he submitted, the ASC sent a follow-up letter to the approving neighbors that included all disclosures about the planned construction the ASC deemed relevant. In response, only two approving neighbors changed their vote. This did not affect Focus's attainment of a simple majority of neighbor support. Two other neighbors—both owners of restricted lots within tract 9200—separately wrote to the POA opposing Focus's proposed construction, one calling it a "visual obimination [*sic*]" because of its proximity to Lindbrook Drive.

9

Satisfied with the approvals from neighbors he received in the 500-foot poll, Larian indicated Focus planned to proceed with pouring concrete for the foundation of the house with the setbacks he originally planned. Turner warned him on September 9, 2020, that he would do so at Focus's risk. Undeterred, Focus proceeded.

### III.   The POA Sues to Enjoin Construction

The POA sued Focus on October 20, 2020, alleging breaches of the restrictions and seeking declaratory relief that the restrictions are enforceable and binding against the Property. The POA sought a temporary restraining order, which the trial court denied. But in doing so, the court, as the POA had repeatedly done before, warned Focus that it was proceeding at its own risk.

In balancing the harms, the trial court observed that "[i]f [the POA] prevails, [Focus] will be forced to modify construction to comply with the [restrictions] and any Court order, which would include tearing down the framing and the foundation. The cost (and harm) would fall squarely on [Focus]."

After defeating the POA's request for a temporary restraining order, Focus filed a cross-complaint. Its first three causes of action—breach of contract, promissory estoppel, and declaratory relief—were premised on the 500-foot poll giving Focus the right to proceed. By the fourth cause of action, Focus sought a declaration that the restrictions were invalid.

The case proceeded to a bench trial in January 2023. As part of the trial, the judge conducted a site visit with counsel and viewed some portion of Holmby-Westwood. Following the trial, the court announced findings and a ruling for the POA on all causes of action. Among other things, the trial court wrote: "The

10

ASC's proceedings were reasonable and in good faith, and not arbitrary. In fact, [the POA]'s proceedings were remarkable for the time devoted to [the matter] and for [its] openness to discussing the project with [Focus], including possible changes, and for the [POA]'s openness to allowing [Focus] to poll neighbors in the tract to determine whether they agreed with [Focus]'s plans, subject to the ASC's approval of the letter."

Focus requested a statement of decision on a long list of issues. The trial court thereafter issued a 13-page statement of decision addressing those issues it deemed material to its disposition.

The statement of decision concludes: "The [restrictions] are valid and apply to [the] Property. The [house] on the Property as built . . . does not comply with those restrictions. Focus . . . has not prevailed on its cross-claims. [The POA] is therefore entitled to injunctive relief, namely (1) that Focus . . . be enjoined from construction and completion of [the house]; (2) that the [house] as now built be removed or modified so as to comply with the [restrictions]; and (3) that any [house] build on the Property comply with the [restrictions]."

Judgment entered. Focus timely appealed.

### DISCUSSION

Focus makes four main arguments that the trial court's judgment was error: *First*, that the POA failed to review its plan in accordance with applicable governing documents. *Second*, that the balance of hardships weighs in favor of Focus. *Third*, that "the business judgment rule does not apply." *Fourth*, and finally, that the restrictions are not enforceable. We start with the last point because how the POA sought to enforce the restrictions matters only if they were enforceable to begin with.

11

## I.    Focus Fails to Show the Restrictions Are Invalid

The effect of a recorded document is a question of law. (See *Moore v. Hall* (1967) 250 Cal.App.2d 25, 30; see also *Werner v. Graham* (1919) 181 Cal. 174, 181 (*Werner*) [existence of equitable servitude "purely a question of the construction and consequent effect of the deed"].) We therefore exercise independent review over Focus's claims that the restrictions contained in the Moss Deed, as purportedly extended by the 1975 Extension, are invalid. (See *Veiseh v. Stapp* (2019) 35 Cal.App.5th 1099, 1104 (*Veiseh*) [" 'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.' "].) We need not consider the validity of the 2002 Guidelines insofar as they purport to impose additional restrictions on the Property as the POA conceded below that the 2002 Guidelines are only guidelines and their case was in no way premised on any purported breach thereof.

Focus offers two arguments that the restrictions are invalid,[1] both predicated on the rule stated in *Nahrstedt v. Lakeside Village Condominium Association* (1994) 8 Cal.4th 361, 368 (*Nahrstedt*) that recorded restrictive covenants governing a common interest community are enforceable unless

---

[1]    On appeal, Focus does not question whether, at the time of the 1975 Extension, the Moss Deed's restrictions "affect[ed]" the Property (see 1975 Extension, ¶ 1) under *Werner*, *supra*, 181 Cal. at pages 181 through 186. We therefore do not consider the question and assume, for the purposes of our analysis, that they did.

12

unreasonable.[2] Focus argues they are unreasonable *first* because they apply to fewer than all of the lots in tract 9200 and thus form a "hodgepodge" of restricted and unrestricted lots; and *second*, because neither the restrictions nor the POA's governance would pass muster under the Davis-Stirling Common Interest Development Act (Davis-Stirling; Civ. Code,[3] § 4000 et seq.).

The second argument is easily disposed of. Davis-Stirling applies only to common interest communities—communities, like condominium complexes, where ownership of common elements is shared. (See §§ 4200, 4201.) It does not apply to communities where all properties are individually owned. (§ 4201.) As there is no evidence lot owners in Holmby-Westwood or tract 9200 are common owners of properties outside of their individual lots, Davis-Stirling does not apply. Focus's attempt to define what is "reasonable" by analogy to Davis-Sterling is nothing more than an attempt to expand the act's reach beyond its clearly defined limits. We will not read a statute as regulating activity it plainly does not. (See, e.g., *Wiley v. S. Pac. Transp. Co.* (1990) 220 Cal.App.3d 177, 192; *Fayroyan-Mezhlumyan v. Wells Fargo Bank, N.A.* (2011) 202 Cal.App.4th 195, 205.)

As to the first, or "hodgepodge," argument, Focus relies on *Moe v. Gier* (1931) 116 Cal.App. 403 (*Moe*) and *Terry v. James* (1977) 72 Cal.App.3d 438 (*Terry*) for the proposition that the

---

[2]    We need not address whether the *Nahrstedt* court's analysis properly applies to this case because Focus fails to show the restrictions are unreasonable. Nevertheless, we note *Nahrstedt* involved a common interest development, not a voluntary association of independently owned lots like the one at issue here.

[3]    Undesignated statutory references are to the Civil Code.

13

failure of some tract 9200 owners to subscribe to the 1975 Extension renders its enforcement unreasonable per se. This is not a correct statement of the law. "Even if restrictions are not enforceable as to every lot in an area originally covered by an agreement they may be upheld as to a part of that area if such part is of sufficient extent and so located that the original purpose of the restrictions can be accomplished." (*Fairchild v. Raines* (1944) 24 Cal.2d 818, 828 (*Fairchild*), citing *Downs v. Kroeger* (1927) 200 Cal.743, 749 (*Downs*).) Further, neither *Moe* nor *Terry* involved a covenant that could run with the land under section 1468.

In relevant part, section 1468 applies to covenants between owners of separate parcels (like the 1975 Extension) "to do or refrain from doing some act on [their] own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee . . . ." (§ 1468.) Such covenants run with the land so long as: (a) the lands affected are described in the instrument; (b) the instrument provides successive owners are bound thereby for the benefit of the land owned by the covenantee; (c) the subject acts relate to the use, repair, maintenance or improvement of the land; and (d) the instrument containing the covenants is recorded in the proper county's recorder's office. (*Id.,* subds. (a)–(d).)

In *Terry*, the only theory on which the covenant could bind successors was as an equitable servitude. (*Terry, supra,* 72 Cal.App.3d at p. 442.) In *Moe*, after concluding the covenant was not enforceable as an equitable servitude, the court also considered whether it was enforceable under section 1468. It was not, because "[t]here [wa]s no expression in the deed [that the restriction was] 'for the benefit of the land.' " (*Moe, supra,*

14

116 Cal.App. at p. 410.) This finding precluded application of section 1468 under the statute's express terms. But the *Moe* court continued, in what is necessarily dicta, to conclude that even if the restrictions had been expressed as " 'for the benefit of the land,' " they would be not benefits but detriments because the restrictions were varied. (*Moe,* at pp. 410–411.)

In contrast to the deeds in *Moe*, the 1975 Extension satisfies section 1468's requirement that it is expressly made for the benefit of the other landowners. It is for "the benefit of each lot . . . in [tract 9200] whose owner sign[ed] [the extension] . . . ." Even considering *Moe*'s dicta, the 1975 Extension is still distinguishable. The deeds in *Moe* contained no indication whatsoever that they were part of any plan. The 1975 Extension was an agreed plan of varied (or at least potentially varied) restrictions. It was expressly made subject to assent by the owners of at least 49 lots in the tract, which is fewer than all owners. Thus, all signatories knowingly agreed they would subject their properties to restrictions so long as 48 of their neighbors did the same—*and even if more than 30 did not*. Certainly, it is not irrational for residents to consider their neighborhood better off if at least some critical mass of their properties were subject to restrictions than if none were. "When landowners express the intention to limit land use, 'that intention should be carried out.' " (*Nahrstedt*, *supra*, 8 Cal.4th at p. 381.) It is not unreasonable to enforce restrictions here that vary from unrestricted neighbors where the extension's signatories so clearly manifested their intention to accept that outcome and that it bind their successors.

Further, while we need not know why these owners subscribed to the 1975 Extension (cf. *Nahrstedt*, *supra,* 8 Cal.4th

15

at p. 381, citing Epstein, *Notice and Freedom of Contract in the Law of Servitudes* (1982) 55 So.Cal. L.Rev. 1353, 1359), the map of restricted and unrestricted properties in tract 9200 suggests the restrictions are not as randomly distributed as Focus implies.

Tract 9200 abuts the busy Wilshire Boulevard. The lots along Wilshire were never restricted. Some have been developed as high-rise condominiums or apartments; others as a church. Lindbrook Drive is the first street north of Wilshire in the tract and runs parallel to Wilshire between Warner Avenue and Holmby Avenue. Lindbrook then turns away from Wilshire as it crosses Holmby—where the Property sits—and proceeds to Beverly Glen Avenue.

The lots on the south side of Lindbrook between Warner and Holmby all adjoin the unrestricted Wilshire lots. So too do the first two lots after Holmby towards Beverly Glen (those directly across Lindbrook from the Property). Fourteen of the 17 lots adjoining Wilshire lots, including the two across Lindbrook from the Property, chose not to be restricted. But every other lot on the Property's segment of Lindbrook (i.e., between Holmby and Beverly Glen) agreed to the restrictions. And so too did 10 of the 11 lots on the north side of Lindbrook between Warner and Holmby. Put another way, a contiguous group of 22 Lindbrook lots not adjoining a Wilshire lot agreed to preserve continuity with their immediate neighbors so situated. The Property lies practically in the middle of this group. The manifest pattern of restrictions on Lindbrook belies Focus's claim that the 1975 Extension created an "arbitrary patch[work] of restricted homes."

In addition to arguing section 1468's benefit requirement was unsatisfied, Focus makes two other claims[4]: there was no consideration for the 1975 Extension; and it did not satisfy section 1468's recordation requirement.

As to consideration, Focus notes an e-mail from Brown to Larian stating "there were no considerations or benefits" for the 1975 Extension. Notwithstanding this evidence, the trial court concluded there *was* consideration "because by entering into the 1975 Extension [signatories] obtained the promise that the other [signatories] would also be bound by such homeowners' original deed restrictions." This conclusion is undoubtedly correct. (See *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.* (1958) 160 Cal.App.2d 290, 295 ["Mutual promises constitute consideration."].)

As to recordation, the 1975 Extension was recorded in the Los Angeles County Registrar-Recorder's Office, as required by section 1468, subdivision (d). Focus suggests a lack of evidence that the extension "was recorded on each of the [tract 9200 signatories'] lots." It is unclear what deficiency Focus is trying to show. Its authorities state that the document recorded under section 1468, subdivision (d) must appear in the Property's chain of title. It cites one case in which the document did not, such that it did not appear on the buyer's preliminary title report. (See *Reiner v. Danial* (1989) 211 Cal.App.3d 682, 687.) But the 1975 Extension *did* appear in the preliminary title report Larian

---

[4]    Focus also observes that perhaps only 58 percent of the homes in tract 9200 signed the 1975 Extension but does not explain why this is material. The 1975 Extension provided it would bind signatories once at least 49 lots accepted, which they did.

received. That report said "[the restrictions in the Moss Deed] have been modified by an instrument . . . [r]ecorded . . . August 15, 1975 as Instrument Number 3719, of Official Records." Focus fails to show section 1468, subdivision (d) was unsatisfied.

## II. Focus Fails to Show the POA's Processes and Procedures Negated Their Enforcement Efforts

Focus argues the manner in which the POA enforced the restrictions against it rendered such efforts invalid. It relies upon *Ironwood Owners Association IX v. Solomon* (1986) 178 Cal.App.3d 766, 722 (*Ironwood*) for the proposition that the POA can enforce the restrictions by injunction only if it has "[(1)] followed its own standards and procedures prior to pursuing such a remedy, [(2)] that those procedures were fair and reasonable, and [(3)] that its substantive decision was made in good faith, and is reasonable, not arbitrary or capricious." Focus addresses only the first and last standards and does not contend the POA's procedures were unfair or unreasonable. We are not persuaded by Focus's arguments.

As a preliminary matter, determination of the *Ironwood* factors is factual. (See *Ironwood*, *supra*, 178 Cal.App.3d at p. 772.) " 'We apply a substantial evidence standard of review to the trial court's findings of fact.' " (*Veiseh*, *supra*, 35 Cal.App.5th at p. 1104.)

### A. Compliance with Standards and Procedures

Focus asserts the POA failed to comply with its procedures in three ways. *First*, the ASC failed to consider all relevant factors in evaluating Focus's plans. *Second*, it failed to follow the disapproval formalities contained in the 1975 Extension. And *third*, the POA's president was not duly appointed.

18

### 1. Consideration of Evaluation Factors

The 1975 Extension gives the ASC substantial discretion in evaluating a proposed construction plan. Its analysis "shall include" consideration of the following factors: "conformity to the deed restrictions"; "effect upon the environment"; and "harmony of external design with the surrounding community." But the use of the word "include" shows these factors are nonexclusive. The 2002 Guidelines disclose additional factors the ASC may consider, including architectural style and the "interest, welfare, or rights of any or all  property owners in [Holmby-Westwood]."

The trial court found "the evidence demonstrates that the ACS [*sic*] properly considered the factors set forth in the [Moss Deed and 1975 Extension] in declining to approve [Focus's] construction . . . ."

Focus contends the ASC "limit[ed] its focus solely to [compliance with the setback restriction]." There are several problems with this argument. *First*, the evidence cited is that the restrictions were the *dispositive* consideration, not the *only* consideration. That failure to comply with the setback restriction was the reason approval was withheld does not mean the ASC considered nothing else. *Second*, the setback restriction obviously implicates the other mandatory factors in the 1975 Extension. A property built 80 percent closer to the street than its neighboring property could be considered out of harmony with the surrounding community and detrimental to the neighborhood's environment. *Third*, the ASC's communications with Larian show it considered factors aside from strict conformity to the restrictions. For example, Turner also couched the setback issue as one of nonconformity with neighborhood character. She further considered the proposed architectural style, reporting the ASC

19

was "generally pleased with the design of the house and only ha[d] minor concerns about finishes."

Focus complains the ASC "arbitrarily *added* an inapplicable criterion about the 'front yard,' which does not exist in the Moss Deed." But this argument has at least two problems. *First*, as already noted, the ASC's evaluation criterion in the 1975 Extension is nonexclusive so consideration of unlisted criteria is not prohibited. *Second*, the argument is purely semantic. The Moss Deed identifies the street the house must face (Lindbrook) and the minimum distance between the street and the house (35 ft.). The result is a mandatory front yard with a depth at least as great as the setback distance.

At the same time it complains the ASC added new criteria, Focus contends the POA should have considered the results of the 500-foot poll. Paradoxically, it later argues, citing *Ironwood*, that the 500-foot poll was an impermissible delegation of the ASC's approval role. In any event, Focus failed to conduct the 500-foot poll in accordance with the ASC's instructions. While the ASC's follow-up disclosures might have provided all information the ASC considered relevant, it did not violate any procedure when it disregarded the results of a poll gratuitously authorized and improperly conducted before the disclosures were made.

### 2. No Signed Written Disapproval

Focus contends its plans were deemed approved under the 1975 Extension because the ASC did not send it a written disapproval signed by four members of the committee within 45 days after it submitted them. The POA responds that the 2002 Guidelines provide that a request for variance from a deed restriction can never be "deemed" approved. Focus does not address this in its reply. Focus's proposal to build a house within

seven feet of Lindbrook Drive is indisputably a request for a variance from the 35-foot setback requirement. We treat Focus's lack of response to the POA's argument that the guidelines preclude "deemed" variance approvals a concession of merit. (See *Rudick v. State Board of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [the appellants' "fail[ure] to respond in their reply brief to the [respondent's] argument" treated as concession of merit on that point].)

### 3.    The POA's President Is a Nonresident

Focus notes Brown, the POA's president and a member of the ASC, used to live in Holmby-Westwood but does not anymore. The POA's articles of incorporation limit its membership to owners or residents. Its bylaws say only members are eligible to serve on its board. However, it also provides a new path to membership: admission of a nonresident by a majority of the board. As no one asserts otherwise, we assume Brown was admitted as a member pursuant to this provision of the bylaws and elected president of the board.

Focus contends the POA is violating corporate law by including in its bylaws a provision at odds with its articles of incorporation. For this proposition, it cites Civil Code section 4205—part of Davis-Stirling—and "Corporations Code section 5810 et seq." The former is inapplicable for reasons already discussed. The latter citation fails to alert us to the provision Focus considers applicable here. Moreover, even if Brown is ineligible to be a POA member because the bylaws are subordinate to the articles of incorporation, Focus fails to establish what effect such ineligibility has on the POA's actions in this case. (See *Martine v. Heavenly Valley Limited Partnership*

21

(2018) 27 Cal.App.5th 715, 728 [court not required to serve as the appellants' backup counsel and supply arguments for them].)

## B.    Validity of Substantive Decision

Focus fails to demonstrate that the ASC's refusal to approve its plans was made in bad faith, was unreasonable, or was arbitrary or capricious. The trial court expressly found there was no evidence the POA enforced the setback restrictions arbitrarily. Substantial evidence supports this conclusion.

There is no dispute the Property violates its setback restrictions by distances ranging from five to 28 feet. By the terms of the 1975 Extension, the ASC was *never* bound to exempt it from those restrictions. Rather it had "discretion" to do so only if it "f[ound] . . . there [we]re compelling reasons for such a variance."

Focus describes what it considers compelling reasons the ASC should have granted it a variance. But what the ASC "finds . . . compelling" is inherently subject to the discretion of the ASC. Turner explained the fundamental problem with Focus violating the setback restrictions: "[The house] sticks out like a sore thumb when you're driving down the street, so it does impact the feel of the neighborhood." She continued, "it sticks out because the property is at an apex. It comes to a very peculiar kind of corner, and it comes very close to the curb." The trial judge had the opportunity to evaluate those statements when he viewed the Property himself and included his observations about the Property's siting in concluding the ASC's enforcement was not arbitrary.

While Focus does not like the ASC's decision—and reasonable people could disagree as to its wisdom—the evidence shows it took Focus's requests seriously, sought to educate Larian

22

on the restrictions applicable to the Property, and expressed a willingness to be flexible in balancing Focus's interests with those of the neighbors. ASC members were responsive to Larian's requests for information, prompt in their communications with him, gave him ample opportunity to present his plans and consider alternatives, and even offered an avenue for approval that did not require a change in the proposed nonconforming setbacks. Nothing about this indicates arbitrariness, caprice, or bad faith.

In the face of the ASC telling him otherwise, Larian made the ill-considered decision that his conduct of the 500-foot poll was good enough and proceeded to erect a nonconforming structure. The implicit message was clear: Larian did not intend to play by the ASC's rules. This necessarily changed the ASC's posture towards Larian. After that point, the ASC's credibility and future effectiveness was at stake. As Turner explained to Larian in an August 26, 2020 e-mail, "the ASC is responsible to all [owners of restricted properties.] If a precedent is set that [restrictions] are ignored, it puts every home at risk . . . ."

The evidence permits only one conclusion: the POA acted within the bounds of reason in seeking to enjoin Focus's nonconforming construction. In so concluding, it is unnecessary for us to consider application of the business judgment rule.

## III. Balance of Hardships

" 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' [Citations.] The burden is on the party challenging the ruling to demonstrate such abuse." (*Grail Semiconductor, Inc. v.*

*Mitsubishi Electric & Electronics USA, Inc*. (2014)
225 Cal.App.4th 786, 801.)

Focus argues the balance of harms favor it as a matter of law because "[t]here was no evidence of pecuniary harm to [the POA]," whereas Focus "would lose millions if ordered to demolish the Property."

The trial court relied on *Morgan v. Veach* (1943) 59 Cal.App.2d 682, 691 (*Morgan*) for the proposition that " '[w]here equitable relief is sought, proof of actual or substantial injury is not essential, the establishment of a violation of a uniform building restriction being all that is necessary to entitle a complaining owner to relief . . . .' "

Focus argues *Morgan* is distinguishable. First, it notes *Morgan* was a direct suit between homeowners, not one involving a property owners' association. But the 1975 Extension eliminates the distinction between the two insofar as standing to seek equitable relief goes.

Second, Focus argues the " 'uniform building restriction' " requirement of *Morgan* is unsatisfied. (*Morgan, supra,* 59 Cal.App.2d at p. 691.) As already noted, that "requirement" is not absolute and must be determined based on the facts and circumstances of the restricted area.

*Fairchild*, *supra*, 24 Cal.2d 818, is a decision of our Supreme Court issued the year after *Morgan. Fairchild* addressed the enforceability of restrictive covenants[5] in a tract

---

[5] The restrictive covenants at issue in *Fairchild* were racially restrictive covenants, which were at the time considered legal as between private parties, but which have long since been invalidated both at the federal and the state level. (*Shelley v.*

24

where approximately half the lots were not restricted. *Fairchild* recognized " 'courts will not enforce restrictive covenants by injunction in a case where, by reason of a change in the character of the surrounding neighborhood, not resulting from a breach of the covenants, it would be oppressive and inequitable to give the restriction effect, as where the enforcement of the covenant would have *no other result* than to harass or injure the defendant, without benefitting the plaintiff.' " (*Id.* at p. 826, italics added.) The question in *Fairchild* was therefore "whether the original purpose of the restrictive covenant c[ould] still be realized by the owners of the lots [in a subsection of the tract]." (*Id.* at p. 828.) The court held "[t]he fact that all the lots in the tract are not subject to the covenant is not conclusive of the issue. Even if restrictions are not enforceable as to every lot in an area originally covered by an agreement they may be upheld *as to a part of that area if such part is of sufficient extent and so located that the original purpose of the restrictions can be accomplished.*" (*Ibid.*, italics added.)[6]

Here, the trial court found the restrictions allow the POA "to preserve the appearance and compatibility of the properties in Tract 9200 that are subject to the 1975 Extension" and were presently being enforced for that purpose. We again note the

_____

*Kraemer* (1948) 334 U.S. 1, 20–21; *Coleman v. Stewart* (1949) 33 Cal.2d 703.) We rely on no part of the *Fairchild* case relating to the repugnant notions about racial covenants expressed therein.

[6] For this last proposition, the *Fairchild* court cited *Downs*, *supra*, 200 Cal. at page 749, a building (as opposed to racial) restriction case, giving it indisputable currency in our context. (*Fairchild, supra,* 24 Cal.2d at p. 828.)

25

Property sits practically in the middle of a group of 22 lots—including an unbroken line of 17 lots to the Property's east and west on the north side of Lindbrook Drive—that agreed to be restricted. Under the principle of *Downs* stated in *Fairchild*, these facts unquestionably support the trial court's exercise of discretion to enjoin Focus's construction.

## IV. Focus's Remaining Arguments Do Not Merit Consideration

In its opening brief, Focus states, in a footnote, that the trial court's judgment "includes a wall that was extraneous to the pleadings." The issue is not revisited in argument. It is forfeited. (See *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1260, fn. 10 [argument raised in footnote without analysis or discussion is waived].) Similarly, we disregard Focus's other arguments not addressed in the argument section of its opening brief under separate headings as improperly presented and without merit. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)

Finally, in its reply brief, Focus argues for the first time on appeal that it did not need to add other lot owners as indispensable parties in its cross-complaint. Focus's opening brief contains no argument that the trial court erred in entering judgment for the POA on the causes of action in Focus's cross-complaint. Accordingly, all related issues are forfeited. (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [issues not raised in opening brief are forfeited or abandoned].)

## DISPOSITION

The judgment is affirmed. The POA is entitled to its costs on appeal.


RICHARDSON, J.


WE CONCUR:


LUI, P. J.


CHAVEZ, J.